| 70 | 410 |
|---|---|
| 173 | 261 |
| 70 | 410 |
| 180 | 635 |
| 70 | 410 |
| 203 | ⁸156 |
| 70 | 410 |
| e204 | ⁸ 35 |
| 70 | 410 |
| e206 | ¹448 |
| 70 | 410 |
| 31 SC | 124 |

# Whelen's Appeal.—Nevins's Estate.

1. The principle that for a mistake in law, equity will not relieve against a deed, &c., will not bar relief, if the party has acted upon a want of proper knowledge which he could not obtain, though vigilant in his search; nor where necessary information has been refused and withheld; nor where unconscionable advantage of circumstances whereby his will was coerced, and by undue pressure he had done what otherwise he would not.

2. Relief against mistake in law will be given where there is actual or legal fraud, by one who thus seeks to obtain the execution of an agreement to benefit himself or those for whom he acts.

3. A daughter against whom charges were made in a statement exhibited her by the executors of her father's estate for the settlement of her share, was entitled to the freest access to her father's books by herself or her agent or attorney.

4. When a party has acted in misconception or ignorance of his title, and executed an agreement, &c., to his prejudice, he will be relieved in equity.

5. A bill of review is not allowed to stand on strict law and against equity.

6. The Act of October 13th 1840 (Review in Orphans' Court) has no application to a case in which the distribution and payment were voluntary by the accountant, and made before the account filed.

7 A will contained this clause: "And whereas, during my lifetime, I have made, or may hereafter make, advances in money, stock or otherwise, to my said son, or to the husband of either of my said daughters, and it is my express intention that the shares of all my said children shall be equalized, I hereby direct that such advances respectively shall be deducted from the share to be paid to the trustees of my said son, or to either of my said daughters whose husband may be so indebted to me." *Held,* that "advances"

[Whelen's Appeal.]

did not mean *debts* of the husbands but gifts to the husbands as advancements on account of the shares of the daughters, and they were not chargeable with interest.

8. Commissions to executors on an estate of $168,000 under the circumstances fixed at 3 per cent.

9. In this case an account after a distribution of the bulk of the estate upon a statement showing advancements and deducting them, a subsequent account of the executors with the report of auditor confirmed, payment of the balance found due, &c., under the circumstances opened and corrected.

January 12th and 29th. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from the decree of the Orphans' Court of *Philadelphia* : No. 212, to July Term 1871. In the estate of James Nevins, deceased.

James Nevins, the decedent, died March 11th 1866, leaving a will dated January 3d 1862, with a codicil dated May 24th 1865; letters testamentary were granted to Townsend Whelen, Edward S. Whelen, Jr., and J. Willis Nevins, executors appointed therein.

He gave to a nephew $1000 ; to his three daughters, whom he named, all his paintings, engravings, statuary, books, furniture and clothing ; and then bequeathed and directed as follows :—

" Of all the rest, residue and remainder of my estate, real and personal, of what kind soever it may be and wheresoever situated, I give, devise and bequeath one equal fourth part to my said daughter Isabella, one equal fourth part to my said daughter Cornelia, one equal fourth part to my said daughter Sallie Kirkbride, to them, their heirs and assigns for ever, to be paid to and held by them respectively for their separate use and benefit free from any claim, right or demand of their respective husbands in the manner contemplated by the laws of Pennsylvania for securing the rights of married women."

The remaining one-fourth he gave in trust for his son, with remainder to the son's children.

He further directed :—

"And whereas during my lifetime I have made or may hereafter make advances in money, stocks or otherwise to my said son or to the husband of either of my said daughters, and it is my express intention that the shares of all my said children shall be equalized, I hereby direct that such advances respectively shall be deducted from the share to be paid to the trustees of my said son or to either of my said daughters whose husband may be so indebted to me. I direct and empower the executors of this my last will and testament or the survivor of them hereinafter named, to sell and convey in fee simple for such prices and on such terms as they or he shall deem fit, all or any part or parcels of such real estate as belongs or may belong to me in the state of Illinois and Missouri, or either of them, or elsewhere, and to

[Whelen's Appeal.]

make, execute and deliver all necessary deeds and conveyances for the same to any purchasers or purchaser thereof, on payment of the purchase-money, or on such security therefor as they or he may deem sufficient, and without any obligation on the part of any purchaser to see to the proper application of the purchase-money."

The daughters were Isabella, the wife of Edward S. Whelen, Sr., Cornelia, the widow of Joseph R. Fry, deceased, and Sarah K., the wife of Sylvanus W. Godon.

On the 18th of May 1868, the executors exhibited to the residuary legatees a paper headed:—

"Schedule of proposed partial distribution of the estate of James Nevins, Esq., deceased."

By that statement the distribution to each of the legatees amounted to $40,400.

The distribution to Mrs. Cornelia Fry was as follows:—

"To Mrs. Cornelia N. Fry:—

| | | |
|---|---|---:|
| 1000 shares All. Val. R. R. stock, at $10, | $10,000.00 | |
| 100 shares Shamokin Valley & P. R. R., at 35, | 3,500.00 | |
| 50 shares Lehigh Valley R. R. Co., at 62, | 3,100.00 | |
| 20 shares Leh. Val. R. R. pref'd stock, at 70, | 1,400.00 | |
| To cash paid her April 30th, . . . | 250.00 | |
| To cash paid her, . . . . . | 517.31 | |

$18,767.31

| | |
|---|---:|
| For amount directed to be charged her for advances during the life of the testator, as per statement rendered, . . | $21,445.02 |
| U. S. tax paid on this share, . . | 187.67 |

$40,400.00"

Attached to "Schedule" of distribution was the following, signed by all the distributees, including Mrs. Fry:—

"We, the undersigned, being all the parties interested in the distribution of the estate of James Nevins, deceased, certify that we have examined the within statement of a proposed partial distribution of said estate, and are satisfied therewith, and hereby authorize the executors to proceed with the distribution.

"Witness our hands and seals this 18th day of May, A. D. 1866."

The amount charged to Mrs. Fry as "advances" was made up of charges to her husband J. R. Fry in his lifetime with interest; charges to the firm of J. R. & H. B. Fry, of which her husband was one, with interest; charges to Mrs. Fry herself with interest. The items of charge were from January 1st 1855 to January 1st 1866, and the interest was charged to March 31st 1866.

[Whelen's Appeal.]

| | |
|---|---:|
| The total of the principal charged to J. R. Fry was | $4,259.53 |
| The interest was　.　.　.　. | 2,098.20 |
| The principal charged to the firm,　.　. | 22,000.00 |
| The interest,　.　.　.　. | 2,168.83 |
| The principal charged to Mrs. Fry was　. | 900.00 |
| The interest,　.　.　.　. | 18.46 |
| | $31,445.02 |

From which was deducted credit March 31st 1866,
　viz. :—

| | |
|---|---:|
| " Less appraised value of 1000 shares of Allegheny Valley R. R. stock at $10,"　.　. | $10,000.00 |
| | $21,445.02 |

Mrs. Fry gave also the following receipts:—

"Received, June 5th 1866, of the executors of the estate of James Nevins, the following stock, viz. one thousand shares Allegheny Valley Railroad stock, one hundred shares Shamokin Valley and Pottsville Railroad Company stock, fifty shares Lehigh Valley Railroad Company stock, and twenty shares Lehigh Valley Railroad Company preferred stock, appraised at the value of eighteen thousand dollars, which, with seven hundred and sixty-seven dollars thirty-one cents, previously paid me, and the United States internal revenue tax on inheritances, one hundred and eighty-seven dollars sixty-seven cents, and the amount to be charged me for advances made during the lifetime of the testator, amounting to twenty-one thousand four hundred and forty-five dollars two cents, is to be charged to me as forty thousand four hundred dollars in the distribution of said estate, as set forth in an agreement dated May 18th 1866, and signed by me.

　$18,767.31
　　187.67
　21,445.02
　————
　$40,400.00
　　　　　　　　　　　　　　CORNELIA N. FRY."

"Received September 19th 1866, of the executors of the estate of James Nevins, deceased, five hundred and ninety dollars eighty-two cents, in full for my proportion of income collected by them to date (one-fourth of $2363.27).

　$590.82　　　　　　　　　　CORNELIA N. FRY."

J. Willis Nevins died August 21st 1866, leaving a widow and three children.

On the 2d of October 1866, the account of the three executors was filed by Townsend Whelen, and on the 16th of November,

[Whelen's Appeal.]

presented to the Orphans' Court, when it was referred " to Edward Hopper, Esq., as auditor to audit, settle and adjust the same and report distribution of balance."

The total amount of the charges was        $168,977.82

The credits belonging to the administration account, including credits to executors for commissions, were      $12,177.01

They did not strike a balance on the administration account, but introduced into its credit side the amount paid in partial distribution to the residuary legatees, not taking credit for " advances " to Mrs. Fry and J. W. Nevins, but referring to them and stating their amount, so as to exhibit the equality of distribution.

The balance still in the hands of the executors thus appeared to be     .     .     .     .     .     .$15,985.89

The auditor sat in December 1866, the precise day did not appear.

He reported that he gave notice of the time and place of meeting "according to law and the rules of court, by advertisement made twice successively in the Legal Intelligencer and every other day five times in the 'Press,' a daily newspaper," &c., and on the day fixed and at subsequent adjourned meetings he was attended by Townsend Whelen and Thomas D. Smith, Esq., of counsel with the accountants.

He allowed the executors commissions at the rate of 5 per cent. amounting in all to $8198.89, and therefore gave them credit with $1151.68—besides the amount for which they had taken credit in their account, and after making other deductions for expenses, &c., he found the balance for final distribution to be $14,629.09, which he distributed equally amongst the residuary legatees.

He made no reference in his report to the advances or the partial distribution stated in the administration account except to say:

" The account, a certified copy of which is hereto annexed, was duly vouched, and the credits claimed by the accountants were found to correspond with the vouchers produced by them."

This report was prepared March 22d 1867, and on the same day notice of its preparation was given to Thomas D. Smith, Esq., as counsel for the accountants; no other persons received notice.

The report was filed in the clerk's office April 5th 1869, the auditor further reporting that no exceptions to it had been filed.

Mrs. Fry afterwards executed the following receipts:—

" Received January 29th 1867, of the executors of the estate of James Nevins, deceased, five hundred dollars on account of my distributive share of said estate.

     " $500.                CORNELIA N. FRY."

" Received April 20th 1867, of the executors of the estate of James Nevins, deceased, one thousand dollars of the six per cent.

bonds of the Philadelphia and Erie Railroad Company, two thousand dollars of the second mortgage of the six per cent. bonds of the Pennsylvania Railroad Company, and three hundred and fifty-one dollars six cents in cash, which, with five hundred dollars paid me January 29th 1867, and the United States tax on inheritances, thirty-six dollars twenty-one cents, is to be charged to me as thirty-six hundred and fifty-seven dollars twenty-seven cents, the balance awarded to me by the auditor's report on executors' account filed October 2d 1866.

"$3657.27. CORNELIA N. FRY."

"Received April 20th 1867, of the executors of the estate of James Nevins, deceased, one hundred and eighty-eight dollars twenty-five cents, in full, for my proportion of income collected to date (one-quarter of $753).

"$188.25. CORNELIA N. FRY."

On the 15th of May 1868, Mrs. Fry presented a petition to the Orphans' Court for a review of the executors' account. After setting out the preliminary facts of the will, legatees, &c., the petitioner proceeded:— * * *

"That some months after the death of the said testator, the said Townsend Whelen, acting executor, exhibited to your petitioner a statement of the estate, in which there was a deduction of $21,445.02 against the one-fourth share of said estate coming to your petitioner, being stated by the acting executor to be "*charged to her for advances made to her husband during the life of the testator,* viz. : $21,445.02." Your petitioner, on the presentation of this statement, accepted the sum of $18,954.98, as her share of her father's estate, and shortly afterwards was informed of more being due each child of said testator, in consequence of increased value of stocks, and received in common with the others $3657.37, making $22,612.35 in cash, and with the $21,445.02, amounting to one-fourth of her father's estate.

"That on the second day of October 1866, less than seven months after the death of the said testator, the said acting executor filed an account in the office of the register of wills, and on the 18th of December 1866, Edward Hopper, Esq., was appointed an auditor to settle and adjust the said account.

"That on the fifth day of April, A. D. 1867, the said auditor filed his report, without exception.

"That your petitioner never received any notice of the filing of the account, or of the appointment of an auditor, or of any of the meetings of the audit, or any notice of the filing of the report of auditor, and was in entire ignorance of the matter until recently.

"That your petitioner was informed by the said Townsend Whelen,

[Whelen's Appeal.]

long before, that there would be no auditor appointed, and therefore never looked for such notice.

" That the report of the auditor shows that no party attended before the auditor except the said Townsend Whelen, acting executor, and his counsel.

, . " That your petitioner, upon inquiry, has been informed that the said sum of $21,445.02, which is charged against her share as an advancement, was no such advancement whatever, but was the amount of a judgment held by the said estate of the said testator against the firm of Joseph R. and Horace B. Fry, trading together as J. R. & H. B. Fry, brokers." * * *

On the 28th of May Townsend Whelen filed an answer containing, amongst other things, as follows: * * *

" That J. Willis Nevins, one of the executors, and a brother of petitioner, acted with the respondent in settling the estate up to the time of his death, in August 1866; and both he and the respondent frequently conferred with the petitioner in reference to the estate, and gave her full information as to her position in regard to it.

" That on or about the 31st of March 1866 the respondent furnished the petitioner with a detailed account and statement of the amount proposed to be charged to her share of her father's estate in the distribution in accordance with his will.

. " The petitioner frequently called on respondent and conversed with him on the subject of these charges, which consisted chiefly of advances made by the testator in his lifetime to Mr. Joseph R. Fry, the husband of petitioner. She also sent her counsel (Daniel Dougherty, Esq.) to see him on the subject, and they were both fully informed as to the nature and character of the charges stated in the account.

" On the 10th May 1865 a judgment was entered in the District Court of Philadelphia in favor of James Nevins against Joseph R. and Horace B. Fry, for $23,566.38. This being one of the assets of the estate, the respondent used his best efforts to collect the amount due on it, being $14,168.83, but without success. Mr. Horace B. Fry was without means, and alleged that he had never received any part of the money advanced, but that a great part of it had been used by J. R. Fry in erecting a dwelling-house on Walnut street, the title to which property was held in trust for his wife, the present petitioner.

" Previous to the testator's death the respondent had been for many years very familiar with all his accounts and business transactions; and with this knowledge of the matter and of the advances made by the testator, the respondent prepared a full statement or schedule, showing the proportionate share due to each of the heirs after deducting the advances which the testator directed by his will to be charged to them. This was done for the purpose of

making a partial distribution, so that the heirs might be enabled to receive the bulk of the estate without waiting until the executors' account should be filed and audited. That schedule was submitted to all the parties interested, and approved of by them, as will appear by their written endorsement thereon."

The petition set out the paper of May 18th 1868, and the receipt of June 5th 1868, heretofore stated, and proceeds : * * *

" He did file an account within seven months after the death of the testator. But this was done with the consent and approbation of all the heirs, including the petitioner.

" There were no debts due by the decedent, and the estate being a large one, there was no reason to delay the distribution of it among his children, to whom it was devised. * * * Neither the petitioner or her counsel, or any of the heirs attended before the auditor, and it was never supposed that they intended to do so, or to interpose any objection to the account or the distribution, after they had signed the agreement and receipts already referred to. The greater part of the estate had already been divided between the heirs, and the auditor was only required to confirm the distribution which they had assented to, and to make a further distribution of the balance in the hands of the executors. * * * There was no haste in closing the audit. The auditor was appointed on the 18th December 1866, and his report was not filed until the 5th of April 1867. During all this interval the respondent was repeatedly applied to by the petitioner to know when the balance of the estate would be distributed, and he invariably informed her that the accounts were in the hands of Mr. Hopper, the auditor, and that no distribution of the balance could be made until his report was filed and confirmed. The respondent denies that he ever told the petitioner, as she alleges, that there would be no auditor appointed, or that he ever contemplated allowing his accounts to be settled without reference to an auditor." * * *

He inserted Mrs. Fry's receipt of April 20th 1867, above stated, as proof of her knowledge of the audit.

" Under the rule of court the auditor is only required to give such notice to the parties who have attended his meetings, and as the petitioner never appeared before him, she was not entitled to such notice.

" The respondent believed that he had exercised due care and prudence in the management and settlement of the estate, and that he was fully protected by the written agreements and receipts signed by all the parties interested. He therefore proceeded, immediately after the auditor's report was confirmed, to make a final distribution of the balance in his hands, amounting to $15,985.89, and after paying the petitioner her share of the estate, and taking her full receipt and discharge for it, he also transferred and delivered over to her all the securities and collaterals which

20 P. F. Smith—27

her late husband had deposited with the testator for his indebtedness, in order that she might have the benefit of whatever could be realized from them.

"The respondent is well satisfied, from his frequent interviews and conversations with the petitioner, that she knew perfectly well at the time that the executors had filed their account, and that it was pending before the auditor for several months before he made his report. She was also fully informed with regard to the charges against her share of the estate, by reason of advances made by the testator in his lifetime, the greater part of which enured to her own benefit, in the erection of a dwelling-house at No. 2008 Walnut street, which was held in trust for her, and has since been disposed of, and the proceeds thereof, amounting to about $23,000, invested by her trustee for her use, and from which she is still deriving the income.

"When the agreement for distribution was entered into and signed by all the heirs, the petitioner fully understood the character of it, and assented to its correctness in every respect.

"It was considered to be a family matter between a brother and his sisters, and they were all competent to act and judge for themselves in this division of their father's estate. It was done between them amicably in accordance with the schedule referred to." * * *

On the 11th of June Mrs. Fry filed a reply, in which she said: * * * "That the account and statement of the deductions to be made from her share of her father's estate, were furnished her by the respondent, and she was informed by him that the will of her father expressly authorized and ordered such deductions to be made, and your petitioner never knew until lately that such was not the case.

"That your petitioner was deceived and misled by such misrepresentations, and believed that said will really did so charge her, and relying upon the truth of such allegations and influence, by absolute necessity did sign such agreement.

"That upon the death of Joseph R. Fry, the husband of your petitioner, it was found that his entire estate had been required to pay the indebtedness of the firm of Jos. R. & Horace B. Fry.

"That within eight months after the death of Mr. Fry, your petitioner's father also died, and she was left without father or husband, with three children to support, and, with the exception of the house in which her family had been living, entirely without means. * * *

"That your petitioner, when she signed said agreement, was actually in need of money, which was refused her by the respondent until she complied with said distribution—threatened with the expenses of legal proceedings—informed that the creditors of the firm of J. R. & H. B. Fry would be shown a method of seizing

her own little property, to wit, the house in which she had formerly lived—entreated by her children to avoid family differences—assured by the respondent that there was no alternative, and ignorant of business details, your petitioner signed the aforesaid agreement.

"That had your petitioner known that under the terms of her father's will no such deductions were directed to be made, no considerations of comfort or poverty would have induced her to permit her children and herself to be stripped of one-half their heritage, to wit, $21,445.02, to be divided among the three remaining distributees, none of whom were in such need of the same as herself.

"That your petitioner reasserts most positively that she was informed by respondent that there would be no auditor appointed, and the reason given was that it was unnecessary and would only add expense, and that if she did sign any receipt in which the word auditor occurs, as stated by respondent, it made no impression upon her, nor would the notice there contained have been of much service, as the receipt quoted is dated April 20th 1867, and the auditor's report of the said estate was filed April 5th 1867, fifteen days before such signing.

"That your petitioner denies the statement of the respondent, that the charges made against her share of testator's estate 'consisted chiefly of advances made by the testator, in his lifetime, to Mr. Joseph R. Fry, the husband of your petitioner.' * * * $14,168.83 of the amount so charged was money loaned to the firm of J. R. & H. B. Fry, and for which sum judgment was obtained against said, &c., * * * the larger part of the said charges were not advances to the said J. R. Fry individually at all.

"That Daniel Dougherty, Esq., never acted as your petitioner's counsel, and that he never was 'fully informed as to the nature and character of the charges stated in the account;' that Mr. Dougherty, who had been a friend of Mr. Fry in his lifetime, and who had had charge of other matters in which your petitioner was interested, did call on the respondent and desired to see the books of the testator and to make some inquiries concerning the distribution of said estate, but his request was refused peremptorily and all explanation denied.

"That your petitioner's counsel (John J. Ridgway, Jr.) also endeavored, within a short time previous to the filing of her petition, to obtain the respondent's consent to examine said books, but was unable to do so." * * *

"There existed on the books of the said testator an individual account against the said Joseph R. Fry, commencing in 1855, and amounting in all to 'over $4000,' and which account was entirely separate and apart from the indebtedness of the firm of J. R. & H. B. Fry, with whom the testator was in the habit of frequently

[Whelen's Appeal.]

transacting business, and this 'over $4000,' with *interest* from 1855, to wit, $3276.19, equals $7276.19, which was added to the amount of the judgment against the said firm, to wit, $14,168.83, and the sum total, to wit, $21,445.02, deducted from the share of your petitioner, and she is informed and believes that, even assuming this amount to be correctly charged as *advances* made to her husband, she is not liable for interest, and that she is thereby, under all circumstances, entitled to the $5445.02, interest illegally charged to her in the aforesaid settlement, and your petitioner is *now* also prepared to prove satisfactorily that the said individual indebtedness, to wit, ' *over* $4000,' should be only $1750." * * *

She denied that the money lent by the testator to the firm of J. R. & H. B. Fry was used by J. R. Fry in erecting her dwelling-house, and averred that she was in possession of the house three years before the money was lent.

"That your petitioner never received any ' collaterals and securities which her late husband had deposited with the testator for his indebtedness;' if she has, they are and were worthless; she did receive a policy of insurance upon the life of Horace B. Fry for $10,000, which, she presumes, was held by testator as security for the said money loaned to the *said firm*, but this policy has become worthless by the non-payment of the premiums. The Allegheny Valley Railroad stock, which was sold to the said firm by the said testator, and their note taken for $11,000 in payment thereof, was kept by the testator, until the time of his death, as collateral security for payment of said note, and upon his death was appraised by the respondent at $10,000, and placed among the assets of the estate. The settlement of the said estate was a family matter, and she was therefore unsuspicious and entirely confident of being fairly dealt with." * * *

On the 17th of June, Townsend Whelen filed a rejoinder, in which he denied that he had misrepresented anything to Mrs. Fry, or in any way misled or deceived her; averred that she was furnished with a copy of the will, a detailed statement of the charges made against her, distinguishing between those to her husband and those to the firm; he averred that she knew the advances made to the firm were for the benefit of her husband; he denied that she was refused money until she would sign the agreement, and reasserted that Mrs. Fry had been informed of the whole matter and understood her rights.

Mrs. Fry further petitioned the court to allow her to amend her petition and ask for a review in relation to the commissions allowed the executors.

Townsend Whelen filed an answer in which, after stating briefly the allegations contained in his former answer, he concludes:—

"The widow of J. Willis Nevins, one of the executors, as his

administratrix, received one-third of the commissions, E. S. Whelen, Jr., one-third, and respondent the other third.

" J. Willis Nevins died August 21st 1866, and no part of the commissions can be recovered from his estate, as it consisted only of these commissions; the other executor resides in Europe and has no estate here.

" Respondent is advised that the question now before the court being merely whether there can be a review, and that the merits or propriety of the charge for commissions are not open in this stage of the cause, refrains from any statements which would justify the charge if the question were open; but submits the foregoing as a full answer and bar to the right of a review, even if the charge were more than the court would have sanctioned had exception been taken, nothing more being alleged than that the decree of the court has awarded excessive commissions."

The court (Peirce, J.) made the following order:—"Without deciding any question of fact or law which is presented by the petition for review, and the subsequent pleadings in the case, we are of opinion that there is sufficient ground in the allegations set forth for referring the matter back to the auditor, with instructions to report upon all the questions which arise upon the whole record as it is now before us."

Under this reference the auditor held a number of meetings and much testimony was taken in support of the allegations of the respective parties; the evidence was conflicting and in some instances directly contradictory as to facts.

The auditor reported, very much in detail, the accounts of the testator with the firm of the Frys and J. R. Fry individually, and the transactions with Mrs. Fry subsequently to the testator's death; and found as a fact that at the testator's death, J. R. Fry was his debtor:—

" For advances in cash to him personally and interest, . . . . . . . . $4,259.53

For advances in cash to his firm for transactions
with his firm, . . . $22,000.00
Less collateral, . . . 10,000.00
————— 12,000.00

Total amount due by him, . . . $16,259.53
Interest to date of settlement hereinafter mentioned, . . . . . . . 4,267.03
Amount due for advances from October 13th 1865,
to January 26th 1866, by Mrs. Fry, $900.00
Interest on same, . . . . 18.46
————— 918.46

$21,445.02"

[Whelen's Appeal.]

He further reported :—

* * * "The executors, with a view to distribute the estate at
a period earlier than they could have been required so to do, pre-
pared a statement or schedule of distribution of securities to the
value of $160,000, including the amounts due by the son and by
J. Reese Fry, as proper subjects of deduction under the will, as they
were advised was a proper and legal construction, and adding these
to the assets; whereas, if they were not to be deducted they were of
no value. A meeting was had at the office of one of the executors on
the 18th day of May 1866, when this statement or schedule, a copy
of which is annexed to this report, was produced, examined and dis-
cussed.

" There is no proof that anything was said or done to induce
Mrs. Fry to sign this paper, other than such explanations, as in
the opinion of those interested in the settlement of the estate were
demanded by the circumstances of the case. It has been shown
that she was very angry at one time, and used extreme language;
but this would seem to have been more in reference to the course
taken by her father in disposing of his estate; and the auditor
has sought in vain for anything in the evidence to show or to sustain
an inference that any information or explanation necessary to an
adequate understanding of the paper, and its effect when signed,
was not given to her. If she did not apprehend the nature and
character of the transaction to which she committed herself, it
must have been because she did not give her mind to the subject,
and certainly not because of any fault or omission of Mr. Whe-
len, the executor." * * *

The auditor then gives the schedule of partial distribution, and
the approval of the legatees of May 18th 1866, the former pro-
ceedings before him; and Mrs. Fry's receipt of April 26th 1867
(as before stated), and proceeds :—

" And thus the matter rested until May 16th 1868, when Mrs.
Fry filed her petition for review.

" Upon the matter, as it now stands before us, two questions
are presented :—

" 1. Were the deductions properly made?

" 2. Were the commissions properly charged?

" 1. I find, as matter of fact, none of the material allegations
in the petition proved.

" Mrs. Fry had legal notice of the audit. It is proved that she
was told, pending the audit, that it was being held. She certainly
knew that an audit had been held when she signed the receipt for
the balance awarded to her by the auditor. * * *

" If, as matter of law, which will presently be noticed, there
was an error in the construction of the will of Mr. Nevins, or a
misapplication of its provisions, there was no fact not known and
made abundantly clear to Mrs. Fry when she united in the author-
ity to the executors, and they acted upon it. * * *

[Whelen's Appeal.]

" The question then comes, what is the meaning of the will?

" It is alleged that the testator intends *advancements only* to be deducted.

" If this is so, strictly speaking, there was none to be deducted except the individual indebtedness, and the recital in the will, unless as to that, would be without meaning or application; but while a husband, as our law stands, cannot take his wife's property or claim it, it would be inconsistent to hold that money paid to him is a payment on account of that property in anticipation or advance of the vesting of the legal title thereto, which is the legal meaning of *advancement.* It would seem, however, that the testator, Mr. Nevins, certainly contemplated and referred to such advances of money as did and would, agreeably to common acceptation, constitute a *debt.* His language is, " *such amounts as they may be so indebted to me.* * * * I hold that Mr. Nevins meant *debts*—that is, *advances,* which were, in fact and in law, loans and constituted *debts.* The counsel for the petitioner urged that some of these debts were barred by the statute, and that the amount, $1250, was not borrowed from the testator, Mr. Nevins. I must look at the meaning of the will as the law of the case, and I find that meaning to be, what is charged as a debt, if not repaid, to be deducted. * * *

" The remaining question is that of commissions; these were 5 per cent. It is now contended that they were excessive.

" Had this point been raised at the audit, it would have received careful consideration, and possibly I should have been inclined to reduce it—yet it was not overlooked. * * *

" In this particular case, however, there are answers to the point, one of which seems to me conclusive:—

" 1. It is too late, at such a distance of time, to have a review on such ground, on such a point.

" 2. If, however, this were otherwise, circumstances exist which would render a change in this case exceedingly oppressive.

" The present accountant is one of three executors who divided these commissions among themselves in equal proportions. One died, leaving no estate but this share of commissions, which has been paid to his legal representative. Another, to whom the share has been paid, has been long absent in Europe, without property here, and with no estate of his own.

" Now, even though I might possibly have awarded a less sum for commissions, I deem it a very plain case for a refusal to change the decree now, on the ground, that by the delay, a state of things has arisen which renders it inexpedient and unjust to interfere with the amount as it now stands, and which was acted on by the executor, who is called upon to suffer by the proposed change. Of this the petitioner should not complain, as the delay was her own.

[Whelen's Appeal.]

" It has been shown to the auditor that before the executors
filed this account, Mrs. Fry consulted counsel with reference to
the deductions made from her share in the settlement of the
estate, and that he told her what he thought she ought to do in
the premises."

Mrs. Fry filed with the auditor a number of exceptions to his
report. He finally reported that he saw " no reason for changing
his report as originally made."

All else necessary to an understanding of the case is to be
found in the opinion of the court below, approved by the Supreme
Court and delivered July 23d 1870, after argument of the excep-
tions to the auditor's report, by

ALLISON, P. J.—" The account of the executors of James Nevins
was referred to an auditor, whose report was confirmed without
exception. Upon a petition for review, presented by Mrs. Cornelia
N. Fry, one of the children of the decedent, and a legatee under
her father's will, who is entitled to one-fourth part of his estate,
less such deductions as her share was subject to, it was ordered,
after argument, that the account be referred back to the auditor,
with instructions to report upon all questions which arise upon the
whole record as it was then before us.

" On the 18th day of May 1866, two months and seven days
after the death of Mr. Nevins, the four children of the testator
executed a paper, by which they agreed to a distribution accord-
ing to a statement therein contained of the greater portion of the
estate. This paper showed that $21,445.02 were deducted from
the share of Mrs. Fry, which is made up of charges in the account-
book of the deceased, against Joseph R. Fry, the husband of the
exceptant; against the firm of J. R. & H. B. Fry, and against
Mrs. Fry individually. These entries are in part in the hand-
writing of Mr. Nevins, and in part in the handwriting of Townsend
Whelen.

" On the 29th of April 1867, Mrs. Fry receipted to the execu-
tors of the estate of James Nevins for $3657.28, the balance
awarded to her by the auditor's report and the executors' account,
filed October 2d 1866.

" In her petition for review the petitioner swore that, notwith-
standing the acknowledgment contained in this receipt, she did
not know of the account having been referred to an auditor, and
that she had been put off her guard by Townsend Whelen, the act-
ing executor, who stated to her that to save expense the account
would not be audited. In her testimony, taken before the auditor
upon the reference back, this statement is repeated in the most
positive manner, to which she adds, that the receipt was signed
without a knowledge of its contents ; that it was not read by her
before she appended her signature to it.

" This statement is contradicted by the Messrs. Whelen, when

under examination before the auditor. It is not, however, asserted by any one that Mrs. Fry was at any time present at the audit; nor is it in proof that she had personal notice of the appointment of the auditor, or that she was informed of the time or place of meeting, or that any direct or special notice, relating to the reference of the account to Mr. Hopper, was given to her. The auditor finds that she had legal notice; that due publication was made, and holds that she is concluded upon the question of notice by such publication.

"The first questions to be considered are the avoidance of the effect of the signature of Mrs. Fry to the agreement of distribution, and the power and the duty of the court to open the decree of confirmation. If this cannot be done, the report, as it now stands, must be confirmed, and an examination into the merits, legal as well as equitable, of the deductions from Mrs. Fry's share of her father's estate, and the alleged overcharge of commissions, must be refused. The auditor decides against this application, not only on the fact of notice, but on the merits, and also on the well-settled principle that, for a mistake of law, relief will not be given against the unwise or improvident execution of a deed or agreement. But this doctrine, though founded on principle, and supported by authority, will not be allowed to bar the way to relief, where the party seeking to avoid the consequences of his own deed, shows that he has acted upon a want of proper knowledge which he was not able to obtain, though vigilant and diligent in his search for it, or where information to which he was entitled, and which was necessary to the formation of a correct judgment as to the performance of a proposed act by which his rights are to be effected, has been withheld from or refused to him. Nor is the principle which the auditor invokes in support of his conclusions applicable to a case in which unconscionable advantage is taken of circumstances in which a suitor is placed, whereby his will is coerced, and he has by undue pressure been induced to do that which he would not otherwise have done. Much more clear is the case where there is actual or legal fraud; where there is a moral or legal wrong on the part of one who seeks to obtain by these means the execution of an agreement from which a benefit is to flow to himself, or to another for whom he acts.

"It is clearly settled that where, with a mistake in law there is found mixed up other ingredients, showing misrepresentations, stating that which is not true, or concealing that which ought to have been made known; where imposition, undue influence, mental incapacity or surprise are established, relief will be afforded to one who has thus been imposed upon and induced to do that which it is contrary to equity to maintain.

"Judge Story, in the first volume of his Equity Jurisprudence, under the head of 'Mistakes,' states the doctrine at length, with its

qualifications, and refers to some of the cases in which the general principle, relied on by the auditor, has been held not to apply. As in the case of Pusey v. Desbouvrie, 3 P. Wms. 315, where a daughter held a legacy of 10,000*l.*, upon condition that she would release her orphanage share, which amounted to 40,000*l.*, accepted the legacy and executed the release. On the ground that she did not fully understand her right to have an account first taken, although informed that such was her right, the release was set aside, and her orphanage share was given to her. In Evans v. Lewellyn, 1 Cox R. 333, a conveyance was set aside for the reason that it had been improvidently executed. Lord Kenyon remarks : ' The party was taken by surprise ; he had not sufficient time to act with caution, he was not competent to protect himself, and therefore we are bound to afford him such protection.'

" These cases are not without their importance in the consideration of this application. The first is ruled on the fact that full information and explanation were not given ; and the second on the ground of surprise, and an improvident execution. We have both these elements standing out in the undisputed facts of this case. The testimony shows that Mr. Townsend Whelen, upon application made to him, on behalf of Mrs. Fry, by a member of the bar of the highest respectability, who was well known to Mr. Whelen, refused permission to him to examine the books of the testator, in which the charges were made which Mr. Whelen claimed to deduct from Mrs. Fry's portion. This is confessed by Mr. Whelen, accompanied by an explanation which, however satisfactory to himself, allows the fact to remain that light was refused which was every way proper should have been given, and at a time when it was of the utmost importance that it should not have been withheld. Mr. Whelen testified that he named another person to Mrs. Fry, who should advise with her in regard to the settlement of her father's estate, but after the refusal mentioned she was not bound to accept a suggestion of this kind emanating from him ; such a suggestion was in itself a sufficient reason for its rejection ; and upon every principle of right and of fair dealings, she ought to have been allowed the freest access to her father's books, either by herself or by her chosen agent or attorney. This conduct on the part of Mr. Whelen makes a stronger case for Mrs. Fry than the facts as they are stated in Pusey v. Desbouvrie, made for the complainant in that case. Evans v. Lewellyn supports this application to open the decree on the ground of haste in the execution of the agreement of distribution. The short time that had passed after the death of Mr. Nevins, a little more than two months, makes the transaction a very uncommon one, showing unusual expedition in securing, by consent of the parties, a division of the principal portion of the assets of the estate.

[Whelen's Appeal.]

"It was not accomplished without controversy, without strenuous resistance on the part of Mrs. Fry, and that it was pressed upon her by Townsend Whelen and Edward S. Whelen, is, we think, abundantly clear from the whole testimony. Townsend Whelen testifies that he told Mrs. Fry that the estate could only be settled by her allowing the deductions from her share which he claimed, and that he had been so advised by counsel. If to this is added the facts testified to by Mrs. Fry, which are uncontradicted, that she was suffering at that time great sorrow because of the comparatively recent death of her husband and father; that she was distressed and annoyed by the want of money to meet debts then due, and to supply the wants of her household, and that her children urged her to sign the agreement to avoid family alienations, we have a case of surprise, of undue pressure, and a condition of circumstances which we think show, as in the latter case cited, that she was not able to protect herself, and that she is therefore entitled to claim the protection she has invoked. This is all outside of the portion of the testimony of the Messrs. Whelen and Mrs. Fry, which is highly contradictory, the latter swearing that she was repeatedly threatened by Townsend and Edward S. Whelen with the loss of other property, which was held in trust for her, if she refused to allow the deductions, and that they possessed the knowledge that would enable them to accomplish this result.

"All of these statements are denied in the most positive manner by T. and E. S. Whelen. But putting out of the case these controverted matters, we think it is made clear by the testimony on both sides that there were excited and angry disputes on the subject of these allowances, and the question of Mrs. Fry's signature to the agreement of distribution, and that enough has been presented to require us to open the decree of confirmation and examine this application upon its merits.

"There is another well-settled principle which favors this application, which is, that when a party has acted under a misconception or ignorance of his title, and has executed an agreement or conveyance to his prejudice, he will be relieved in equity. In this case the title of Mrs. Fry to the one-fourth part of her father's estate rested on his will, and in the charges which he had made in his books against the share which would come to her. There was ignorance of title here which was not the result of negligence on the part of Mrs. Fry, but an ignorance forced upon her by the refusal of the executors to furnish the evidence for which she called. This is not, therefore, a case which stands upon the ground of a compromise, based on a doubtful construction of a will, from which equity will not relieve, but is mixed up with other considerations of law and fact, which takes it from under the operation of the rule upon which the auditor, in a measure,

[Whelen's Appeal.]

seems to have rested his refusal to go behind the agreement of the 18th of May 1866.

" We are not forgetful of the fact that this is not a proceeding in equity for relief, but that it is a petition for review in the Orphans' Court, which, though not in strictness a court of equity, is greatly controlled by the principles recognised as equitable, and by which a chancellor would be guided upon an application by bill in equity. A bill of review is therefore never allowed to stand on strict law and against equity: Stevenson's Appeal, 8 Casey 324. By the Act of October 13th 1840, a petition of review may be entertained within five years after final decree, alleging errors, which shall be specifically set forth, and the court·are directed to give such relief as equity and justice may require; provided, that the act shall not apply to any case in which a balance found due shall have been actually paid and discharged. This provision can have no ¦application to a case in which distribution or payment was voluntary on the part of an executor or administrator, and where it was made before account filed, for in such case there is no balance which has been ' found due.' And such was the fact when distribution and payment was made, from which the deductions were claimed that are now alleged to exhibit error in law, apparent on the face of the record, which, if well founded, give to the Orphans' Court undoubted statutory authority and jurisdiction to entertain the application for review of the account. Nor does a confirmation of an account of an executor or administrator prevent its re-examination, unless the particular item impeached has been expressly litigated and adjudicated: Clark v. Callaghan, 2 Watts 259. It will not protect an accountant from answering for a *devastavit* where there has been a misapplication, though credit be regularly claimed and allowed: Pry's Appeal, 8 Watts 264. Nor will it preclude a creditor from controverting an assertion of payment, nor a legatee or distributee from questioning alleged payment to them; nor will it bar a widow's claim because of a deduction allowed in payment of her husband's debt: Foulk v. Brown, 2 Watts 214; McLanachan v. Commonwealth, 1 Rawle 359; Rittenhouse v. Levering, 6 W. & S. 201; Hovy v. Becker, 2 Barr 470; Keech v. Rinehart, 10 Id. 240. In this case there is no pretence by any one that the disputed items were litigated before the auditor, or brought to the knowledge of the court, nor that anything more was done by the auditor than to take the agreement of distribution, signed by the parties in interest, as it was furnished to him by the executor, and upon this alone found his report covering the matters contained in said agreement. The items, which are disputed and questioned in the petition for review, are interest upon $4259.53, which sum is charged in the books of Mr. Nevins against Joseph R. Fry, the husband of the

petitioner; the sum of $14,168.83, made up of principal and interest upon an account of the testator against the firm of J. R. & H. B. Fry, and $918.46 charged to Mrs. Fry individually. Exception is also taken to the charge of five per cent. commissions, which were retained by the executors on the aggregate sum of $163,977.82.

"The determination of the most important questions which are raised by the exceptions to the report involves the proper construction of the following clause of the will:—

"'And whereas, during my lifetime, I have made, or may hereafter make, *advances* in money, stocks or otherwise to my said son, or to the husband of either of my daughters, and it is my express intention that the shares of all of my said children shall be equalized, I hereby direct that such *advances* respectively shall be deducted from the share to be paid to the trustees of my said son, or to either of my said daughters whose husbands may be indebted to me.'

"The auditor finds that the testator did not intend that the *advances* in 'money, stocks or otherwise,' to his son, or to the husband of either of his daughters should be regarded as, and should in fact constitute *advancements*, but that they should be regarded as debts, and under this view he sustains the deductions claimed by the executors. Is this the true interpretation of the will?

"The intention of the testator, if it can be gathered from the will, must answer this question, and this, we think, he has not left in doubt or uncertainty. His purpose is clearly expressed in the phrase 'it is my express intention that the shares of all of my said children shall be equalized.' To accomplish this the advances are to be deducted from the share of this son, or from those of his daughters 'whose husbands may be indebted to me.' The auditor is influenced in arriving at this conclusion by the term indebted, and from this argues that he 'referred to such advances of money as did and would, agreeably to common acceptation, constitute a debt.' But these advances made and to be made by the testator, were not limited to money; *stocks or otherwise,* is the phrase used, which last word would cover anything of value, of which he would make advances; it might be real estate, evidences of debts or money due to him, or any other kind of personal property. To advance or make advances of such kind of property, if voluntary on his part, and without solicitation of the sons-in-law (and there is here no evidence of such solicitation), would not of itself convert that which was thus advanced into debts (4 Wharton 141); such advances would rather stand as gifts, to be accounted for or not, as the donor should direct, and in such manner as should be specified by him. Where there is no promise to pay, express or implied, how could the relation of debtor and creditor be estab-

lished in the sense in which the auditor holds that it existed between Mr. Nevins and Joseph R. Fry?

" The testator does not say that these advances shall be treated as debts, so as to carry with them the ordinary incidents of a debt, but says, ' the husbands who shall be *so* indebted.' How indebted? Evidently as he had provided for and designated in his will; who should have received from him such advances in money or property on account of the shares of his daughters.

" And these advances were not intended to be collected as debts from his sons-in-law, but were to stand as advances until the death of Mr. Nevins, when they were to be cancelled by deducting them from the shares of the estate to which the daughters would be entitled whose husbands should be so, or in this way, indebted to the testator. He evidently treated these moneys or properties given to the husbands of his daughters as advancements made to the daughters themselves.

" The end to be attained is the equal division of the estate among the four children, in such a way that no injustice would be done to either of them, and this is to be reached, by first taking from each share the advances made to his son, or to his sons-in-law. We, therefore, regard this as a direction to treat the advances as advancements made to the son or to the daughters through their husbands. Thompson's Estate, 6 Wright 345, is a much stronger case against the view taken by the auditor than the one before us. The sum claimed to be a debt was charged to the son of the testator as debtor, and is twice stated in the account kept by the father as *money, and as money loaned.* This was held by the Supreme Court, upon the fact of intention, to be an advancement, and not a debt.

" If we are right in our interpretation of the disputed clause of the will, two results follow : First, the sums of money charged to Joseph R. Fry, are to be treated as advancements made to Mrs. Fry, and because the testator so directed they are to be taken from her portion of the estate, but without interest; and second, a sale of stocks to the firm of which Joseph R. Fry was a member, which stand charged against the firm, and which is nowhere carried by Mr. Nevins to the individual account of J. R. Fry, is a mere debt of the firm, and cannot now be converted by the executors into a gift or loan, or advance; because a sale is not an advance, the testator not having directed it to be so treated, it remains a debt. And if a debt which grew out of a business transaction with the testator, which remained on that footing until his death, it does not belong to the designated advances which he directed should be deducted; for it is only the advances which he had or might make to his sons-in-law, and not their debts, which were to be taken from the share of his daughters. That a debt due by a husband cannot be deducted from the portion of a daughter is

[Whelen's Appeal.]

clearly settled. Yundt's Appeal, 1 Harris, is an authority in point. So also is Seagrist's Appeal, 10 Harris 424. In this case the term *advanced* is held to be equivalent to advancement; the language of the will is, 'What I have given and advanced in my lifetime, to any of my children, shall be deducted from their respective shares:' Levering *v.* Rittenhouse, 4 Wharton 141, supports the doctrine, that to convert an advance or gift to a child into a debt, such an intention must be made to appear. That if a father, without solicitation, gives to his son a sum of money, or pays a debt for him, it will be considered a gift or an advancement to the son. This was the case in Thompson's Estate. The father had paid debts due by the son and charged them as money loaned. Looking therefore to the intention of the testator, as we understand it to be expressed in his will, we think it is clear that his purpose was to do no more than to secure the deduction from each share of whatever sums in money or property he may have made advances in his lifetime to his son or to his sons-in-law. In this sense the son or the sons-in-law are to be considered as indebted to him, and not in the sense in which the auditor interprets it. If the testator had no other purpose than this one in his mind when he gave the direction in his will which has given rise to this controversy, and we think none other can be gathered from it, with what justice can it be claimed that the indebtedness of the firm of J. R. & H. B. Fry, growing out of transactions of purchase and sale of stock, upon part of which the testator made a profit of several thousand dollars, is to be regarded as an advance of stock to Joseph R. Fry, and as such to be deducted from Mrs. Fry's share of her father's estate ? We regard this as a debt due by Joseph R. Fry to the testator, and not as an advance made to him, and therefore not a proper or legal deduction from the sum due to Mrs. Fry. Bird's Estate, 2 Parsons 168, is cited against this view, but there the father took the note of the son, which, though outlawed, the auditor held was, under a direction contained in the will, to be deducted from the son's share for money advanced. It does not appear whether interest was charged or not. Berry *v.* Morse, 1 House of Lords Cases 70, seems to have been decided upon general principles, and not on a question of intention of the testator.

" The charge of five per cent. commission is objected to as excessive. The entire estate passed into the hands of the executors in the shape of interest-paying investments in stocks, &c. There was no change or conversion of assets ; nothing required to be collected by suit. The actual duty performed was simply to pay to the legatees their respective portions of the securities (amounting in all to $163,000) after having held them for only a little over two months. This was all of it. Stevenson's Estate, 4 Wharton 104 ; Pusey *v.* Clemson, 9 S. & R. 204 ; Walker's Estate, 9 S.

& R. 223, settle the amount to be allowed in a case of this kind · at three per cent.

"The deduction of $900, with interest, as a debt due by Mrs. Fry, was properly allowed. It was charged against her in the books of the testator, and by his express direction. This is in accordance with the declared purpose of Mr. Nevins to equalize the shares of his children. The intention is shown by the clause of the will above quoted, and regarded in this light we think he intended to charge it against her as a debt. The auditor regards it as contrary to equity to hold the executors responsible to Mrs. Fry, after distribution of the estate among the legatees, and the commissions between the executors. The answer to this is, that the distribution was their own act, to which they required Mrs. Fry to assent in writing, before they would make a division of the estate, and this before account filed or an opportunity afforded to any one to raise a question before the Orphans' Court, as to the legality or propriety of the course adopted by them. Having . insisted upon pursuing this course, and chosen to walk in it with their eyes open, to the manifest injury of the petitioner, they have no right to complain if they are held to the consequences of their acts.

"These views require us to sustain the exceptions to the report of the auditor, upon the material questions covered by them, except so far as they relate to the charge of $918.46 against Mrs. Fry, as stated in the account-books of her father.

"Let a decree be prepared accordingly."

The decree was as follows :—

"And now, July 23d 1870, the exceptions to the report of the auditor having been argued, and it appearing to the court, for the reasons stated in the opinion, that on the 18th of May, A. D. 1866, certain sums of money were improperly deducted from the share of Mrs. Cornelia N. Fry, in the distribution of the estate of James Nevins, deceased, it is ordered and decreed that the account of the executors of the said estate be reformed and corrected accordingly, and the amounts and interest as herein below set forth be credited to the said Mrs. Fry, and the said Mrs. Fry, by her counsel, having come in and informed the court, since the argument and opinion made and delivered in this cause, that she has received certain sums which should be credited to the said executors in the settlement of this decree, it is also ordered that such sums with interest thereon be deducted, and the balance, as herein found, be paid over to her by the said executors.

| | |
|---|---|
| Indebtedness of J. R. & H. B. Fry, . . . | $14,168.83 |
| Interest charged J. R. Fry's individual account, . | 2098.20 |
| One-fourth of the excess of executors' commissions, . | 819.89 |
| | $17,086.92 |

[Whelen's Appeal.]

| Interest upon above amounts from May 18th 1866, to October 2d 1866, . . . . . . | | 384.45 |
|---|---|---|
| | | $17,471.37 |
| Less the amount Mrs. Fry received per auditor's report, October 2d 1866, . . . . . | | 3,657.27 |
| | | $13,814.10 |
| Interest from October '66 to this date (July 23d '70), | | 3,156.86 |
| | | $16,970.96 |
| Less amounts received by Mrs. Fry, April 4th 1868, . . . . . | $1,101.82 | |
| Int. to this date (July 23d 1870), . | 151.41 | |
| March 20th 1869, . . . . | 360.75 | |
| Int. to same date, . . . . | 28.86 | |
| October 21st 1869, . . . . | 101.14 | |
| Interest, do., . . . . | 4.55 | |
| February 19th 1870, . . . | .51 | $1,740.04 |
| Balance, . . . | | $15,221.92" |

Townsend Whelen appealed to the Supreme Court, and, in a number of specifications, assigned the decree for error.

*R. C. McMurtrie* and *G. W. Biddle*, for appellant.—The estate having been distributed, the report cannot be opened either as to the balance or items composing it: Kinter *v.* Elder, 12 P. F. Smith 318; Clark *v.* Callaghan, 2 Watts 259; Pry's Appeal, 8 Id. 253; McLenachan *v.* Commonwealth, 1 Rawle 357.

*J. J. Ridgway* and *D. Dougherty*, for appellee.—Under the facts here equity will set aside the agreement of Mrs. Fry: Perkins *v.* Gay, 3 S. & R. 331; Bank *v.* Brown, 5 Id. 234; 1 Story's Eq. 132–49, § 117, *et seq.*; Abbott *v.* Reeves, 13 Wright 505; Chesterfield *v.* Jansen, 1 Story 132; 2 Ves. Sen. 155; 1 Maddock's Chan. 76; Cocking *v.* Pratt, 1 Ves. Sen. 400; Bishop *v.* Reed, 3 W. & S. 264; Gibson *v.* Jeyes, 6 Vesey 278.

Prior to the Act of October 13th 1840, the Orphans' Court, in its discretion, had power, on petition in the nature of a bill of review to correct an account, after confirmation, for error apparent on its face or new matter discovered since: Downing's Estate, 5 Watts 90; Briggs's Appeal, Id. 91. The Act of 1840 made a bill of review a matter of right, except "when the balance found due shall have been actually paid and discharged;" in these excepted cases the act but left it as before the act, in the discretion of the Orphans' Court: Bishop's Estate, 10 Barr 471; Kinter's

20 P. F. SMITH—28

[Whelen's Appeal.]

Appeal, 12 P. F. Smith 323.   Unless the particular item has been litigated, the confirmation does not prevent re-examination: Keech *v.* Rinehart, 10 Barr 242.

The words "advances" and "advancements" are synonymous: Act of Assembly of 1794, Pamph. L. 319; English Statute, 22 and 23 Car. II.; Index to Kent's Coms., "advances for "advancement"; North Carolina Statute of 1784; Seagrist's Appeal, 10 Barr 424.   In Green *v.* Howell, 6 W. & S. 203, "indebted" is construed to mean "advancement": Thompson's Appeal, 6 Wright 355; Yundt's Appeal, 1 Harris 580.

The judgment of the court was entered March 11th 1872.

PER CURIAM.—Nothing could be profitably added by way of argument to the able and conclusive opinion of Judge Allison in this case, and for the reasons so well set forth therein we affirm the decree of the Orphans' Court made in the case, and dismiss the appeal at the costs of the appellant.