ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA v. McADAM.

(Circuit Court of Appeals, Eighth Circuit. October 3, 1903.)

No. 1,833.

1. BENEFIT INSURANCE—FRATERNAL ORDER—ASSESSMENTS ADVANCED FOR MEMBER BY LOCAL BODY.

The Order of United Commercial Travelers of America is a fraternal organization, which, as one of its features, insures its members against death by accident. It has a supreme council, subordinate to which are local councils. Its insurance or indemnity fund is obtained by the supreme council by assessing the subordinate councils $2 for each member whenever the fund becomes insufficient to pay four death losses. Subordinate councils also maintain an indemnity fund, from which such assessments are paid, which is replenished by assessments on their members. The constitution provides that, whenever a member fails to pay his individual assessment when due, he shall forfeit his good standing in the order and his right to indemnity and benefits, and also that at a regular meeting of his council such member shall be suspended from the order and from all benefits derived therefrom, but may be reinstated by vote. *Held* that, construing said provisions together, and in the absence of any prohibition in the constitution, a local council had power in its discretion to keep up its payments to the supreme council on account of one of its delinquent members, and to thus maintain him in good stand-

ing in the order, and that where a council, instead of suspending a member on his failure to pay an assessment, by resolution expressly determined to advance the amounts assessed against it by the supreme council on his account, which was done, and the council continued to treat and report him in good standing until his death, which occurred from an accident shortly afterwards, when it was reimbursed for such advances, the supreme council, which received and retained the assessments made on his behalf, could not deny his good standing as a member, nor avoid payment of the insurance to his beneficiary, on account of his personal delinquency.

2. APPEAL—REVIEW OF FINDING OF FACT.
The finding of a trial court in a suit in equity on a life insurance policy, made on conflicting evidence that the accident which caused the death of the insured did not happen while he was, or in consequence of his having been, under the influence of intoxicating drinks, cannot be reviewed by an appellate court unless a serious and important mistake appears to have been made in the consideration of the evidence, or an obvious error has intervened in the application of the law.

3. RELEASE—CANCELLATION IN EQUITY—UNFAIR SETTLEMENT OF CLAIM.
Complainant's husband was a member of a fraternal order which insured its members against death by accident. At the time of his death, which resulted from an accident, complainant was too ill to attend his funeral, and she remained in an enfeebled and nervous condition for several weeks. A member of the same local body in the order, in whom she had full confidence, was appointed administrator of his estate, and he assured complainant that the insurance due from the order would be paid soon, and in full. While so believing, she was called on at her home by the administrator and three other members of the order, two of whom were officers of the governing body, who told complainant she had no claim against the order, but offered to pay her $1,000 in settlement, and pressed her for an immediate decision. The administrator, when she talked with him apart, said he knew little about the matter, but that the other men probably understood the situation. Being required to decide at once, she accepted the offer, signed a release, and received a draft for $1,000, which, however, she never cashed. It appeared that she knew nothing of the constitution of the order, nor of the truth of the facts stated by its representatives as grounds for their statement that she had no claim, nor was she ever advised before that its validity was questioned. She in fact had a valid legal claim against the order for $6,300. *Held*, that the settlement so obtained by taking complainant by surprise, and by requiring her to act at once without an opportunity to take legal advice or to ascertain the facts, would not be sustained by a court of equity, but the release would be set aside.

Appeal from the Circuit Court of the United States for the District of North Dakota.

George A. Bangs (J. E. Sater, on the brief), for appellant.
Guy C. H. Corliss (J. M. Cochrane, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. At the conclusion of the trial of this case in the lower court counsel for the respective parties stipulated, in substance, that it should be decided upon the pleadings and the evidence; that no point or objection should be urged by either party to the cause as against the other based upon the insufficiency of the pleadings to present the case of the plaintiff or the defense of the defendant; that the case should be decided in the same manner as though the matters of fact established by the evidence had a sufficient foundation in the pleadings; and that the evidence should be con-

strued in the same manner as though the facts which the evidence proved or tended to prove were supported by proper allegations in the pleadings. In view of this stipulation it will be unnecessary to state the issues which were raised by the pleadings in detail. It will suffice to say generally, concerning the nature of the controversy, that Isabelle D. McAdam, the appellee, exhibited a bill of complaint against the appellant, the Order of United Commercial Travelers of America (hereafter termed the "Order"), for the purpose of setting aside a written release of all claims against said order which she had been induced to execute, and for the further purpose of compelling it to pay to her the sum of $6,300 and interest thereon, which she claimed to be entitled to under the constitution of the order by virtue of her husband's having been a member of the same at the date of his death on January 31, 1900. The release which she asked to have canceled was one executed by her on March 26, 1900, whereby she acknowledged the receipt of $1,000 in full settlement of all claims against the aforesaid order by reason of the death of her husband, who, at the time of his death, was the holder of a certificate of membership in the order. The lower court granted the plaintiff all the relief prayed for in her bill; that is to say, it canceled and annulled the aforesaid release, and further decreed that she have and recover from the defendant order the sum of $7,123.26. The present appeal was taken by the defendant order from that decree.

In the lower court it was contended in behalf of the defendant, and the contention is renewed on appeal, that Thomas J. McAdam, plaintiff's husband, was not one of its members in good standing at the time of his decease, and that his wife was not entitled to demand any indemnity from the order for that reason. This is the first question which deserves attention, and the facts pertaining to its determination are as follows: The appellant above named is an Ohio corporation, which transacts business in many states through the agency of what are termed "subordinate" or "local" councils. By its constitution it promises to pay a certain indemnity to its members in good standing who happen to sustain "bodily injury effected through external, violent, and accidental means which alone shall occasion death immediately or within one year from the happening thereof." The fund to pay this indemnity is obtained by the supreme council of the order by assessing subordinate councils. The constitution of the order provides, in substance, that whenever the indemnity fund belonging to the supreme council becomes insufficient to pay four death losses, the supreme counselor of the order shall make an assessment upon each subordinate council to replenish its indemnity fund for a sum not exceeding $2 for each member in good standing of such subordinate councils, which assessment shall be payable within 15 days from its date; and that whenever the indemnity fund of a subordinate council is less than $2 for each of its members, the supreme counselor shall order an assessment not exceeding $2 upon each member of the subordinate council in good standing for the purpose of replenishing its indemnity fund, which assessment shall be payable within 30 days from its date. In case any subordinate council fails to pay an assessment levied upon it by the supreme council, power is given to the

latter council to suspend the subordinate council or revoke its charter. Other provisions of the constitution require each subordinate council to keep the supreme council advised, by proper reports, of the number of its members and the condition of its indemnity fund. The subordinate council to which plaintiff's husband belonged was located at Grand Forks, N. D., and was known as "Grand Forks Council No. 64." He became a member of that council on February 17, 1896. On August 2, 1899, the supreme counselor of the order directed an assessment at the rate of $2 per each member in good standing to be made against each subordinate council, payable in 15 days, and at the same time directed an assessment of the members of each subordinate council at the rate of $2 per person, the latter assessment to be paid to the subordinate council. Further assessments in all respects like that of August 2, 1899, were ordered by the supreme counselor on September 30 and November 20, 1899. These assessments, known as assessments Nos. 46, 47, and 48, were not personally paid by the plaintiff's husband to the Grand Forks Council, of which he was a member, during his lifetime. At the time these assessments were respectively levied against individual members, the indemnity fund in the treasury of the local or subordinate council, to which McAdam belonged, was not less than $2 for each member of that council in good standing. Notwithstanding the fact that McAdam did not pay assessment No. 46 within the time limited, he was treated as a member in good standing and assessed as such when assessment No. 47 was levied. He was treated in the same manner when assessment No. 48 was levied, although he had not paid either of the prior assessments. In point of fact, the subordinate council dealt with McAdam as one of its members continuously until his death, which occurred as the result of an explosion of gas on January 31, 1900. In the meantime it reported him to the supreme council as one of its members, and advanced and paid on his account, out of its indemnity fund, to the supreme council, the several assessments aforesaid, which were made by the supreme council against the subordinate council. The payments so made on his account, as one of its members in good standing, the supreme council has never refunded or offered to refund to the subordinate council, but still retains. On February 3, 1900, after McAdam's death, the three assessments aforesaid, which he had failed to pay personally, amounting to $6.75, were paid to the subordinate council by an agent of the plaintiff, and out of moneys belonging to her, and the sum so paid was accepted by the subordinate council in satisfaction of its claim against the deceased for the money theretofore advanced in his behalf. Prior to the death of the deceased, and on January 13, 1900, at a regular monthly meeting of the subordinate council, a resolution was passed to the effect that the council carry T. J. McAdam and others, who were then delinquent, until the next meeting, and "that the secretary make an effort to get them to pay up." The next regular meeting after the adoption of this resolution was not held, as it seems, until after McAdam's death.

The contention on the part of the appellant that McAdam was not one of its members at the time of his death, or not a member in good

standing, and hence not entitled to indemnity, is based primarily on a provision of its constitution to the following effect:

"Any member who fails to pay his dues and assessments, or any of them when, and as the same become due and payable, shall immediately on the happening of such default, and by virtue thereof, forfeit his good standing in the order; and he, or any person or persons claiming under him and by virtue of his certificate of membership, shall likewise and at the time such default occurs, and by virtue thereof, forfeit all right to indemnity and benefits of whatsoever character."

It is insisted, in substance, that this provision of the constitution operated proprio vigore to extinguish McAdam's right to indemnity when he failed to pay assessment No. 46 and the subsequent assessments, Nos. 47 and 48, to the subordinate council of which he was a member, notwithstanding the fact that the subordinate council in due time paid out of its own indemnity fund to the supreme council the amount of the assessments which McAdam should have paid to the local council, and reported him as a member in good standing, and elected to give him credit for the money so advanced, and to treat him in all respects as a member in good standing up to the moment of his death.

We have been forced to conclude that this contention on the part of the defendant company must be unsound. It is apparent that the supreme council has sustained no loss in consequence of the alleged default, because it received the three assessments from the local council in due season, and still retains the same. Its own indemnity fund, out of which all losses like the one in hand are paid, is precisely what it would have been, had McAdam paid the assessments punctually. Moreover, the local council has sustained no loss, because the money which it saw fit to advance has been refunded.

The provision of the constitution above quoted, which is invoked to work a forfeiture of the promised indemnity, is immediately preceded by another, which reads as follows:

"All members who fail to pay their dues or assessments when due, shall be suspended from the order, at a regular meeting of the council, by order of the senior counselor, and from all benefits derived therefrom, and if there be no more than two adverse ballots against his reinstatement he may, at a regular meeting of the council, on the payment of a fine of twenty-five cents per month, * * * be reinstated by a regular vote by the ball ballot. * * *"

The two provisions aforesaid, standing as they do in juxtaposition, must be read and construed together; and they must be so read the light of the well-established rule that insurance contracts and other instruments of that nature, whereby an indemnity is promised in case of death or accident, must be construed most strongly against the insurer, and so as to avoid, if possible, a forfeiture of the rights of the insured, where the language employed in formulating the contract gives rise to doubt or uncertainty as to its proper interpretation. As contracts of that nature are formulated by the insurer, and generally with an eye singly to the protection of its own interests, it is the insurer's duty to see to it that the various provisions which they contain are harmonious, and that the intentions of the contracting parties are clearly expressed. First National Bank v. Hartford Fire Insurance Co., 95 U. S. 673, 678, 24 L. Ed. 563; Thompson v. Phenix

Insurance Co., 136 U. S. 287, 297, 10 Sup. Ct. 1019, 34 L. Ed. 408; American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977; Phenix Insurance Co. v. Wilcox & Gibbs Guano Co., 65 Fed. 724, 13 C. C. A. 88, 92. The provision first above quoted cannot be regarded reasonably as working a permanent forfeiture of a member's right to indemnity if he fails to pay an assessment, and as depriving the subordinate council to which he belongs of the right to advance his dues and perpetuate his membership if it is so minded, because the preceding provision, also quoted, gives the local council the power to suspend members "who fail to pay their dues  *  *  * at a regular meeting of the council.  *  *  *" It is apparent, therefore, that the subject of suspending a member who is in default is one to be considered and acted upon at a regular meeting of the local council, and the exercise of this power involves the exercise of some discretion on the part of the local body. No provision of the constitution to which our attention has been directed declares that a subordinate council shall not advance to the supreme council the dues of one of its members who is in default, and by that means preserve his good standing; and, in the absence of such a provision, we know of no sufficient reason why it may not so act, especially as it is vested with authority, to be exercised at a regular meeting, to determine whether a member ought to be suspended. The exercise of the power in question by the members of the local council, who are usually acquainted with the causes which have led to a default, and with the condition of the defaulting member, undoubtedly tends to preserve and enlarge the membership of the order, which is an object that such organizations generally aim to accomplish, and on which their successful operation, in a great measure, depends. The opposite view, that a failure of a member to pay an assessment to the local council the very day it is due terminates his good standing in the order, and extinguishes his right to indemnity, and that the local council has no power, even if it so desires, to retain him as a member and maintain his standing, is not enforced by any apt provision contained in the constitution to which our attention has been directed, and that view, if adopted, would prove harmful to the best interests of the order. Inasmuch as the constitution of the order establishes a system of dual assessments—that is to say, since it directs an assessment to be made at intervals against the respective subordinate councils, as such, to replenish the indemnity fund of the supreme council, and an assessment to be made against individual members to replenish the indemnity fund of each subordinate council, over which fund the local body seems to have full control—it is possible, we think, to place upon the two provisions of the constitution now under discussion a construction which is not only reasonable in itself, but will give to each due effect, and not lead to any conflict. It is obvious that when a member fails to pay a given assessment a certain period will ordinarily elapse between such default and the next regular meeting of the council at which he may be suspended by that body. It may be that during this interval he is not to be regarded as a member in good standing, by virtue of the operation of that provision of the constitution above quoted, on which the appellant relies, and that if injured

during that period he is not entitled to indemnity, provided the previous course of dealing with the member has not been such as to operate as a waiver of the default. But when the next regular meeting of the subordinate council does occur, if the member is not suspended by the local body, as it is empowered to do, but is reported to the supreme council as a member in good standing, and assessments are paid upon that theory by the local council, out of its own indemnity fund, to the supreme council, this operates to restore the member's good standing and right to indemnity. Such action on the part of the local council clearly indicates its intention to carry the member who is in default, and to hold itself responsible to the supreme council for the payment of his dues. Such intention on the part of Grand Forks Council to carry McAdam was not left to be deduced by inference from the failure of the local council to suspend him when it was advised that he was in default, but was expressly declared by the resolution of the local council adopted January 13, 1900, to which reference has already been made.

. The foregoing view—that the provision of the constitution denouncing a forfeiture of good standing and consequent loss of the right to indemnity, for failure to pay dues, is temporary in its operation, and does not occasion a permanent loss of the member's right to indemnity, but that the consequences of such default may be overcome by the subsequent action of the subordinate council to which the member belongs—is confirmed by the fact that if such default on the part of a member, in and of itself, occasions a permanent loss of good standing and the right to indemnity, then there would seem to have been no necessity for inserting in the constitution of the order the other provision conferring on local councils the power to suspend members at regular meetings. It is further confirmed by the fact that the constitution requires local councils to report to the supreme council the number of their members, at stated intervals, as a basis for levying assessments against them, while it does not require a report to be made of members who have lost their good standing for failure to pay dues, but have not been suspended for that reason. It seems clear, therefore, that the constitution of the order does not contemplate the existence of a class of members who have lost good standing and the right to indemnity, but have not been formally suspended, unless it be during the short period which may elapse between the occurrence of a default and the next regular meeting of the subordinate council. Those who framed the constitution seem to have intended that the respective local councils should determine for themselves, at regular meetings thereof, whether members then in default should be definitely suspended, or carried by the local body as members in good standing, and reported as such to the supreme council. In accordance with these views, we are constrained to hold that McAdam must be regarded as having been a member in good standing and entitled to indemnity at the date of his death.

Counsel for the appellee strongly contends that none of the assessments, to wit, Nos. 46, 47, 48, were legal assessments when levied, because the indemnity fund of the subordinate council had not been so far depleted at the time they were levied as to authorize the supreme

counselor to levy them, and that McAdam lost none of his rights by failing to pay them promptly. This view seems to have been adopted by the lower court. On the other hand, the appellant contends that the assessments made by the supreme counselor against the subordinate council operated to deplete the local indemnity fund as soon as the assessments were announced, and hence that the several assessments aforesaid against individual members of the local body were properly levied. It is undoubtedly true, as the appellee contends, that no forfeiture can be predicated upon a failure to pay an unlawful assessment; and, if the assessments in question were made at a time when no power existed to make them, McAdam's failure to pay them at the appointed time did not affect his rights. Miles v. Mutual Reserve Fund Life Ass'n, 108 Wis. 421, 84 N. W. 159; Niblack on Benefit Societies, §§ 250, 252. We find it unnecessary, however, in the present case, to express a definite opinion concerning the legality of the several assessments; being satisfied, for reasons already stated, that McAdam must be regarded as a member in good standing when he accidentally lost his life. These assessments appear to have been made in the same manner that the order had been in the habit of levying assessments, and it may be that the previous conduct of the order, which had been assented to by its members, operated as a contemporaneous construction of the provisions of the constitution, which should be held binding. We would not be understood, however, as expressing a definite opinion on this point, because it is unnecessary to do so.

We turn at this point to consider questions of a different character.

The appellant contends that it incurred no liability to the appellee by the accidental death of appellee's husband, because he was intoxicated at the time, and that this condition of intoxication exempts it from liability, irrespective of the question whether it did or did not contribute to cause his death. This contention is founded upon a provision of the constitution of the order which relieves it from the payment of any indemnity when the death of a member happens while he "was, or in consequence of his having been, under the influence of intoxicating drinks." The learned judge of the trial court, after hearing numerous witnesses who testified respecting McAdam's condition at the time of his death and previously, made a specific finding, which is contained in the record, "that the injuries sustained by said Thomas J. McAdam, resulting in his death, and the said death caused thereby, did not happen while the said McAdam was, or in consequence of his having been, under the influence of intoxicating drinks." This court has been asked to review that finding, and to find, to the contrary thereof, that the deceased was intoxicated when the explosion occurred which occasioned his death. This we must decline to do. This court and other courts have repeatedly decided that, even in an equity case, where the trial court has determined an issue of fact upon conflicting evidence, the finding will be presumed to be correct, and will not be disturbed unless a serious and important mistake appears to have been made in the consideration of the evidence, or an obvious error has intervened in the application of the law. This rule has become so firmly established by judicial decisions of this and other

courts, and the presumption in favor of the accuracy of a finding made by the trial judge is necessarily so strong, in view of the peculiar facilities which he enjoys to ascertain the facts, that we are not at liberty to disregard it.   Warren v. Burt, 7 C. C. A. 105, 58 Fed. 101; Snider v. Dobson, 21 C. C. A. 76, 74 Fed. 757, and cases there cited; Latta v. Granger, 15 C. C. A. 228, 230, 68 Fed. 69.   Nothing is disclosed by the present record to relieve the case in hand from the operation of the rule last stated.   It seems to have been tried by the lower court with great fairness, deliberation, and care, and with the aid of able counsel.   The testimony relative to McAdam's condition on the occasion of the accident is quite voluminous and very conflicting.   Charges are freely made that the testimony of some of the witnesses for the appellant on the point in controversy is utterly unreliable, and ought to be disregarded.   Moreover, it does not seem to be claimed that the death of the deceased was caused by the condition as to sobriety that he may have been in when he met his death.   Under these circumstances, and conceding that the testimony was such that the issue as to intoxication might have been decided either way, we are of opinion, following our usual practice in such cases, that the finding of the trial judge ought not to be disturbed.   The strong presumption which must always be indulged in favor of the finding of the lower court in a case like the one at bar has not been overcome to our satisfaction.

It is finally urged by the appellant that even if it was liable for the full amount of the indemnity now sued for, at the time of McAdam's death, yet that the liability was discharged by the release which the appellee saw fit to execute on March 26, 1900.   This contention presents the question whether that release, whereby a valid claim for $6,300 was released in consideration of the receipt of a draft for $1,000, was obtained in such a manner as will justify a court of equity in upholding it.   It also necessitates a brief statement of the circumstances under which the release was obtained.   After McAdam's death his wife was repeatedly assured by one B. F. Brockhoff, who was a member of the Grand Forks Council, and a personal friend of her husband, as well as his administrator after his decease, that the indemnity due to her from the defendant order would surely be paid, and that $5,000 thereof would be paid in a few days, and the balance in installments. She was utterly ignorant of her rights, except as she was informed by Brockhoff.   She had never seen nor read the constitution of the order, and had no knowledge that the insurance contract was embodied in the provisions of that instrument.   She was quite sick when her husband's death occurred—so sick that she was unable. to attend his funeral—and she remained in an enfeebled condition until long subsequent to March 26, 1900.   Up to the latter date she relied confidently upon the statements made by Brockhoff, expecting that the promised indemnity would be speedily paid, and she seems to have had no knowledge that her right to the indemnity had ever been challenged. On the latter date, however, between 3 and 4 p. m., she was waited upon at her home in Grand Forks, N. D., by four men, to wit, B. F. Brockhoff; W. W. Fegan, secretary of the Grand Forks Council; B. F. Holbrook, grand counselor for the jurisdiction embracing said

Grand Forks Council; and C. B. Flagg, secretary of the order. These men, through Holbrook, acting as spokesman, informed her, for the first time, that her claim had been disallowed because of her husband's intoxication at the time of his death, and irregularities in paying his assessments. This statement greatly surprised her, as she had previously been informed that her claim was valid; and, as she remained silent for a few moments, one of the parties suggested that she go into an adjoining room and confer with Brockhoff, in whom, as they knew, she had great confidence. On retiring to an adjoining room, Brockhoff told her, in substance, that he did not know much about the matter concerning which she had been advised, but that the other gentlemen probably understood the situation, and if she had no claim against the order, as they stated, it would be best to accept the offer which they had come prepared to make; that is, to pay her $1,000. He further told her, however, to hold out for half of the promised indemnity, and on returning to the adjoining room the statement was made by Brockhoff that Mrs. McAdam thought she ought to have half of the indemnity. Thereupon Holbrook said, in substance, that, if she was entitled to be paid half of the indemnity, she was entitled to the whole; that she had no claim against the order, and that they proposed to give her $1,000 because it would cost them that much to contest the claim if she should sue; and that they would prefer to make her a gift of that sum, rather than pay it to a lawyer. The interview was hurried to a conclusion within 20 minutes or half an hour. The statement appears to have been repeated that she had "no claim." One of the parties took out his watch and said "they were in a hurry to get away. Let us hurry up with this business." Being thus informed that she had no claim against the order, and pressed to a speedy decision, the appellee finally signed the release in controversy, which was drawn up by Fegan, and received a draft payable to the order of C. B. Flagg, and by him indorsed. She never cashed or negotiated this draft, or attempted to do so, but shortly after the transaction in question, having in the meantime consulted an attorney and been advised as to her rights, she brought the present suit to annul the release and recover what was justly due her. Brockhoff testified that, as the parties left Mrs. McAdam's residence, Flagg remarked "that settlement was dead easy," and "that he expected to pay $1,500 or more."

The trial court found the facts attending the execution of the release to be substantially as last stated, and, after an examination of the testimony, we fully concur in that view. It is apparent, therefore, that the transaction in question was not one where a person having a demand against another, and full knowledge of the facts on which it depends, makes a claim against that other for its payment, which the latter disputes, whereupon mutual concessions are made by way of compromise to avoid litigation. Mrs. McAdam had no acquaintance with the provisions of the appellant's constitution, and no knowledge of the conditions that would serve to destroy her right to indemnity, or whether such conditions in fact existed. She had heard it said casually that her husband was not intoxicated at the time of his death, but she does not appear to have been aware that intoxication at that

time would forfeit his right to indemnity, while she had been repeatedly assured that the indemnity would surely be paid. While in this frame of mind she was suddenly assured, in the most positive manner, by at least two high officers of the order, that she had no claim against the order, and that the sum of $1,000 which they proposed to pay was not paid by way of compromise of a doubtful claim, but was a mere gratuity. Besides, she was constrained to an instant acceptance or rejection of the offer when she was in a low, depressed, and nervous condition incident to sickness and the shock occasioned by her husband's death. It is furthermore noteworthy that Brockhoff, the only person with whom Mrs. McAdam had an opportunity to confer privately, told her, in substance, that, while he "didn't understand much about it," yet the two officers of the order who asserted that she had no claim "probably understood the situation, * * * and, if there was no claim, it would be better to accept" what they offered. This statement, coming, as it did, from a member of the order and a friend of her husband's, in whom she had great confidence, undoubtedly induced her to believe that the representation that she had no claim was reliable, and that she ought to act on it. We are of opinion that a release obtained in the manner aforesaid cannot be upheld by a court of equity. It is evident that Mrs. McAdam signed the release in the belief that she was not entitled to any indemnity from the defendant order, or, in other words, under a misconception of her legal rights, which was occasioned by the confident assertion of two officers of the order that she had no claim against it, and that what they proposed to pay was in the nature of a gratuity. This statement implied that McAdam was intoxicated when he met his death, and that no action had been taken by the order or the subordinate council to which the deceased belonged that could operate to cure the alleged irregularities in the payment of assessments. Mrs. McAdam appears to have had no knowledge concerning the acts of the local council after her husband was in default, and, even if she had such knowledge, she was not qualified to judge of the effect of such acts upon her right to indemnity. On the other hand, the assertion that she had "no claim," or was not entitled to any indemnity, was made by persons who presumptively were well acquainted with all the facts on which her right to indemnity depended, and who were thoroughly conversant with the constitution of the order, and whose statements, for these reasons, could and ought to be relied upon. In any aspect of the case, when the release was obtained the parties did not negotiate on equal terms. The agents of the order who induced the appellee to sign the release took advantage of her ignorance of material facts on which her rights depended, as well as of her ignorance of matters of law, and hurried her to a decision with indecent haste when she was in a nervous and enfeebled condition. As a natural result of such conduct, she was misled and induced to act under a misconception of her legal rights, for which the appellant should be held responsible. In such cases courts of equity will afford relief. In his work on Equity Jurisprudence, § 849, Mr. Pomeroy, after considering at length the character of mistakes which will serve to entitle one to relief in the forum of equity, says:

"A person may be ignorant or mistaken as to his own antecedent existing legal rights, interests, duties, liabilities, or other relations, while he accurately understands the legal scope of a transaction into which he enters, and its legal effect upon his rights and liabilities. * * * Courts have felt the imperative demands of justice, and have aided the mistaken parties, although they have often assigned as the reason for doing so some inequitable conduct of the other party, which they have inferred or assumed. The real reason for this judicial tendency is obvious, although it has not always been assigned. A private legal right, title, estate, interest, duty, or liability is always a very complex conception. It necessarily depends so much upon conditions of fact that it is difficult, if not impossible, to form a distinct notion of a private legal right, interest, or liability separated from the facts in which it is involved and upon which it depends. Mistakes, therefore, of a person, with respect to his own private legal rights and liabilities, may be properly regarded—as in a great measure they really are—and may be dealt with as mistakes of fact."

Further on in the same section he formulates the following general rule as being eminently just and based on principle, namely:

"Wherever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relation, either of property or contract or personal status, and enters into some transaction, the legal scope and operation ·of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or affirmative; treating the mistake as analogous to, if not identical with, a mistake of fact."

Other text-writers have, in substance, expressed their approval of this doctrine. Kerr on Fraud & Mistake (American Notes by Bump) pp. 398, 400, 401 ; Eaton on Equity, p. 263. In addition to the authorities which are cited by Mr. Pomeroy as recognizing the doctrine stated in the text, the following cases may also be consulted as cases where the doctrine in question has been stated, or, if not stated in terms, has been practically applied: Gerdine v. Menage, 41 Minn. 417, 421, 43 N. W. 91 ; Renard v. Clink, 91 Mich. 1, 3, 51 N. W. 692, 30 Am. St. Rep. 458; Whelen's Appeal, 70 Pa. 410, 427; Berry v. American Central Ins. Co., 132 N. Y. 49, 53, 54, 30 N. E. 254, 28 Am. St. Rep. 548; Freeman v. Curtis, 51 Me. 140; Skillman v. Teeple, 1 N. J. Eq. 232, 245; Bonney v. Stoughton (Ill.) 13 N. E. 833, 837. See, also, Billings v. Aspen Mining & Smelting Co., 51 Fed. 338, 347, 348, 2 C. C. A. 252, 261, 262.

It would not alter the conclusion at which we have arrived, namely, that the release in question ought not to be upheld, even if it were conceded that, when the appellant's agents represented to the appellee that she had no claim against the order, they supposed the statement to be true. In point of fact, it was not true. She did have a valid claim against the order in the sum of $6,300, and it cannot be permitted to profit by a false representation made by its agents, on which the appellee confidently relied, although it was unwittingly made. The manner in which the release was obtained, and the conduct of the appellant's agents on that occasion, preclude such a result. They did not lay before Mrs. McAdam all the facts on which her right to indemnity depended, with which facts they must be presumed to have been acquainted, and, after stating their own view of her rights in the premises, request her to seek competent legal ad-

vice, which they must have known that she needed badly, before acting on the proposition to accept $1,000 in discharge of all claims. On the contrary, they referred her for advice to one of their own number, a member of the order, in whom, as they well knew, she had great confidence, and whose advice would doubtless control her action, who merely confirmed the statement of his associates. By their conduct they also compelled an immediate decision, without allowing her adequate time for proper deliberation. That Mrs. McAdam was taken by surprise, having previously been informed that the indemnity would surely be paid, and that she did not deal on equal terms with the agents of the order, and for these reasons was led to act hastily and improvidently, admits, we think, of no controversy. And where such a state of facts is disclosed, it seems that courts of equity will afford relief against a mistake, although it was purely one of law. Coffman v. Lockout Bank, 5 Lea, 232, 40 Am. Rep. 31, 34; Evans v. Llewellyn, 2 Brown, Ch. 150; 2 Pomeroy's Eq. Jur. § 847; 1 Story's Eq. Jur. §§ 134, 251.

Another consideration, which cannot be overlooked, and should have some weight in a case of this character, is the fact that the defendant order professes to be a fraternal association consisting exclusively of commercial travelers—an association organized, as its constitution declares, "to give all moral and material aid in its power to its members and those depending on them. Also to assist the widows and orphans of deceased members." If these professions do not in themselves establish a relation of peculiar confidence and trust between the order and its members, including the families of deceased members, which impose on it the duty, in all of its dealings with them, of exercising the highest degree of fairness and good faith, they at least justify a court of equity in condemning the unfair method by which the release now in question was obtained. We are of opinion that the Circuit Court acted properly in canceling and annulling it, and that the decree below should be affirmed.

It is so ordered.