## CINCINNATI, I. & W. R. CO. v. INDIANAPOLIS UNION RY. CO. et al.

Circuit Court of Appeals, Sixth Circuit.
December 13, 1929.

Nos. 5395, 5396.

Murray Seasongood, of Cincinnati, Ohio (F. J. Goebel and Lester A. Jaffe, both of Cincinnati, Ohio, on the brief), for appellant.

Joseph J. Daniels, of Indianapolis, Ind. (Joseph S. Graydon, H. N. Quigley, and Maxwell & Ramsey, all of Cincinnati, Ohio, and Baker & Daniels, of Indianapolis, Ind., on the brief), for appellees.

Before DENISON and HICKS, Circuit Judges, and SIMONS, District Judge.

DENISON, Circuit Judge. This case is the result of the situation fully stated in the case of the same title, our opinion in which is reported in 279 F. 356. Thirteen railroads had become associated in the organization of the Union Railway Company, and each had agreed to pay as rental one-thirteenth of the total maintenance. Among the 13 were 2—one leading west and one east from Indianapolis—each encumbered by a mortgage, which were later merged in a consolidated company, which in turn thereupon placed a second (first and refunding) mortgage upon the consolidated property. Later there was a foreclosure of this consolidated mortgage; and the appellant here (hereinafter called plaintiff), was organized to become, and did become, at the foreclosure sale, the purchaser of the two roads. The foreclosure decree provided the purchaser might, within a limited time, elect whether to accept or reject any existing contracts affecting the property purchased. Within the time so limited, plaintiff elected to accept the contract between the Union Company and the eastern railroad, but to reject the one with the western railroad. The rights which were incidental to the eastern contract were thought to be sufficient for the needs of the purchaser, and it would thereby pay one instead of two shares of the maintenance. The Union Company claimed that the purchaser was liable for the two shares of the maintenance cost; and the conflict brought on the former litigation. Eventually the claim of the Union Company was sustained by this court, 279 F. 356; and the Supreme Court denied certiorari (May, 1922), 258 U. S. 629, 42 S. Ct. 462, 66 L. Ed. 800. In July, 1924, plaintiff filed this petition, claiming that its first election was made under a mistake, and that it was entitled to be

relieved therefrom; setting up that the payment of the double cost was burdensome to the point of destruction; and asking approval of a new election by which the Union Company contracts should be entirely rejected. After the Supreme Court had decided a question of jurisdiction (270 U. S. 107, 46 S. Ct. 221, 70 L. Ed. 490), the court below held, in effect, that the plaintiff would have been entitled to the relief asked if the request had been made promptly after the Supreme Court's action in 1922; but that this right had been lost by the delay which occurred after that decision and before filing this petition.

The court below was correct in its conclusion as to plaintiff's original right to this relief. The mistake was, in large measure, a mistake of law; but it was one as to which there was no inexcusable fault. Being the purchaser of two originally separate properties, each carrying an individually collateral contract, and having the right to elect whether to accept or to reject any contract collateral to any of the property, plaintiff was advised by able counsel that it could accept one and reject the other; it expressly did so; unquestionably it never intended to accept both and probably never would intentionally have done so; yet the courts held that it had accepted both; and this was because, under the court's construction, the foreclosure decree did not intend to give separate elections. While this seems to involve a mistake of law by plaintiff, yet the conclusion depended upon the fact finding that the consolidated road had so acted as to merge the two contracts into one; and thus a mistake of fact, to some extent—if not to a controlling extent—underlay the mistake of law.

■ It is now well recognized that equity may, and often will, permit obligations to be reformed or rescinded because based upon a mistake of law; and we think this case comes well within the authorities. Philippine Sugar Co. v. Philippine, 247 U. S. 385, 389, 38 S. Ct. 513, 62 L. Ed. 1177; Pomeroy's Eq. Jurisp., Vol. 2, § 849; Re Smith-Flynn Co. (C. C. A. 8) 292 F. 465, 471, 472.

It is to be noted also that plaintiff's right to rescind is not embarrassed by the necessity of showing that the mistake of law or of fact was mutual. The action in question, the election, was unilateral; the Union Company had nothing to do or say about it. The element of mutuality in the mistake disappears from the problem. See Macknet v. Macknet, 29 N. J. Eq. 54.

■ We agree also that the right to rescind was not lost by the delay before 1922. After the conflict arose, plaintiff prosecuted the litigation without undue delay; and we find no substantial evidence of prejudice suffered by the Union Company on account of this delay during the period while plaintiff might reasonably say it was unaware of the mistake. During the period plaintiff paid, and the Union Company received from the two thirteenth shares, some $200,000 more than would have been paid and received under the one twelfth share which plaintiff intended to accept; and plaintiff does not seek to recover, in connection with its rescission, any portion of the amount it paid before the filing of this petition. The only suggestions of prejudice are two: One is that during this period the other associated railroads had suffered the competition of the plaintiff road as that road was aided by these Union facilities, and that this had been a severer competition than they would have suffered if plaintiff had been on the outside. This suggestion is only that of a possibility. It is not supported by substantial proof that there was any such suffering in material amount. It is clear enough that this prejudice was no more than theoretical.

The other is that during this period the Union Company lost opportunities to rent these two thirteenth shares to some other railroad which would have become and would now be a permanent tenant. Here again the whole matter is hardly more than surmise. Under the existing conditions we think equitably the burden is upon the Union Company and the other associated roads to show a substantial prejudice which would have defeated this right of rescission as the right existed immediately after the Supreme Court's refusal to review our former decision; and it is not shown.

■ A different situation arose when the mistake had been demonstrated by the final decision and the right to rescind had accrued. Ordinarily such right must be exercised with great promptness, and prejudice from delay need not appear. The right to rescind is a privilege; it cannot be held suspended while the holder of the right experiments with other remedies or uses it as a weapon to induce better terms in the existing contract as an alternative to rescission (Grymes v. Sanders, 93 U. S. 55, 62, 23 L. Ed. 798); but to say this is only to apply to such circumstances the general rule of reasonable promptness. Delay for such purpose is prima facie unreasonable; delay which has that aspect must be most convincingly excused. The excuse is to be found here primarily in the public interest involved in the conduct of a railroad and the resulting public duty of plaintiff.

The terminal service which it was giving was much better than it could have given upon withdrawal—indeed, immediate withdrawal would, for the time, have destroyed its ability to give any satisfactory service. The plaintiff was under a measure of public duty not avoidably to disrupt its passenger and freight service, but to give reasonable consideration to an attempt to bring about any available plan which would not injure its public service and which might be found within its operating and financial power to carry out.

Further, it appears without dispute that through separation of grades and other extraordinary expenses falling on the terminal company, the equal fraction cost of the use contracts has enormously increased. Plaintiff's two thirteenth shares (in 1916 $37,000) amounted to about $115,000 for the year 1923,[1] and might be expected to continue at that sum or a greater one. The excess burden for that year, $53,000, capitalized at 5 per cent., is equivalent to an addition of more than $1,000,000 to the funded debt, more than 20 per cent. increase. The proof is undisputed that the continuance of the entire present burden will be ruinous, and will compel a receivership and a foreclosure of the existing mortgages. It is against the now established public policy to permit a railroad to assume burdens which it cannot carry, and which must cause at least interruptions and embarrassment to its public duties. If the railroad were now to apply to the Interstate Commerce Commission for authority to incur the obligation from which it now seeks relief, the authority would very likely be denied. It is even within the bounds of possibility that the commission might prohibit its further performance of the obligation upon its existing terms. See L. & N. Ry. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Cleveland Passenger Terminal Case, 70 I. C. C. 659.

Nor can the effect of the delay to rescind, as constituting an irrevocable election to acquiesce, be rightly judged without observing what was actually done and what would have been the effect of the alternative course. Clearly, the plaintiff never intended to acquiesce permanently in the situation as it was in May, 1922. It was seemingly assumed by the plaintiff's management and president that this rental liability could not be tolerated for any length of time, and could be and

would be eliminated, by a foreclosure and receivership if necessary. With this background, doubtless perfectly understood by the Union Company and the other interested railroads, plaintiff undertook negotiations to get a new contract which it could perform and which would be upon a more reasonable basis. These negotiations did not make much progress, but it cannot be said that the associated railroads had, until shortly before this petition was filed—even if then—definitely refused to consider the subject-matter; and it cannot be denied that plaintiff had at least a reasonable hope of getting rid of this contract without further litigation. The alternative open to the ordinary individual in an ordinary contract—complete withdrawal and repudiation—was not open to plaintiff. It would not have been permitted to abandon its terminal facilities at Indianapolis, at least until it had substitute facilities ready; and indeed, if it now, as the result of this suit, is permitted to reject its entire present rental contract, we assume that it cannot carry that rejection into effect without the approval of the Interstate Commerce Commission—an approval which would be granted or refused largely free from control by considerations of contract or acquiescence or estoppel. It may be also that the particular remedy finally adopted—filing this petition—did not occur to plaintiff's advisers until a late date; but another method of getting the same result had been intended and was rightfully delayed in the endeavor to avoid litigation adverse to the public interest.

The District Judge was not convinced by the record that if plaintiff, in 1915, had not labored under its mistake, it would then have rejected both contracts, but thought that it was at least quite possible that plaintiff would have intelligently accepted both. In this, we assume, he is right; but we think it not controlling. It is now held that plaintiff is not bound by the election which it made in 1915, but that in 1922 it became entitled again to exercise the 1915 right of election; the intervening delay was without plaintiff's substantial fault; we see no reason why it might not, in 1922, exercise this right, in view of what had in the meantime become history, and so could be positively known. This is particularly so because its new election, now to be made as of 1922 or 1924, is not to be retroactive.

We do not intend to hold that the public obligations of a railroad are themselves sufficient in all cases to excuse such delay in election as here occurred. We give them that effect in this case when they are taken in

---

[1] Owing to modifying details, the one thirteenth share was about $62,000. On about the same proportionate basis, the double share was for 1924, $117,000; for 1925, $125,000; for 1926, $122,000.

connection with the further facts, clearly appearing, that the contract was in perpetuity whereby the period of delay is minimized as compared with the life of the contract; that the Union Company and the associated railroads must have been at all times aware of the extremely burdensome character of the existing contract and of the plaintiff's intention at all times in some way to relieve itself of that burden; and that the delay was not likely to cause and did not in fact cause substantial prejudice to the other parties, nor involve any likelihood of changing conditions by which, through delay, the contract might become less objectionable, or indeed desirable, to the plaintiff.

It is the presence of these elements attending upon and in connection with the public interest involved in the conduct of the railroad which persuades us that at the time of filing this petition the right to rescind had not been lost.

The decree below should therefore be reversed, and the case remanded for further proceedings in accordance herewith, with power in the court below to prescribe such conditions as it may think equitable to attend the rescission and new election now permitted.