## SHELL PETROLEUM CORPORATION v. CORN et al.*

### No. 479.

Circuit Court of Appeals, Tenth Circuit.

Jan. 4, 1932.

*Rehearing denied February 8, 1932.

W. K. Koerner, of St. Louis, Mo. (Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., on the brief), for appellant.

A. M. Ebright of Wichita, Kan. (Ebright, Burch & Patterson, of Wichita, Kan., on the brief), for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

On the first appeal of this case [(C. C. A.) 28 F.(2d) 168] it was held that the plaintiff's bill stated a cause of action, and that the lease of the plaintiff (appellant here) covered the minerals under the right of way of the Midland Valley railroad. When the case came back to the trial court, the defend- ants answered that the lease was ambiguous, and therefore open to construction; and, if not, that by mutual mistake it failed to ex- press the actual agreement of the parties. The trial court referred the issues so joined to W. F. Lilleston, Esq., as Special Master. Mr. Lilleston heard the evidence and filed a report and a helpful memorandum opinion. Exceptions were seasonably taken thereto by the plaintiff; the trial court, after argument, denied the exceptions, confirmed the report of the Master, made findings of its own, and entered a decree reforming the lease in ques- tion as prayed, and dismissing plaintiff's bill. This is an appeal from that decree.

There is little room for dispute as to the facts. J. M. Buffington, for a great many years, owned a tract of land near Oxford, Kansas, containing 36.2 acres. In 1911 he conveyed, by general warranty deed, a strip containing 2.7 acres to the Midland Valley Railroad Company. This left him 33.5 acres. In 1923 he negotiated with Fred Barnes for an oil and gas lease on this 33.5 acres, and an agreement was reached by which Barnes would take a lease, with the usual royalty reserved to Buffington, and pay him a bonus on an acreage basis. This was done, and Barnes paid him a bonus on 33.5 acres only. Barnes and Buffington both testified that their agreement covered only the 33.5 acres; Buffington told Barnes he had theretofore conveyed the 2.7 acres, and he did not want the lease to cover that acreage. Buffington's deed to the railroad contained a warranty of title; the lease contained a warranty of ti- tle; Buffington was 80 years old, and he in- sisted that the 2.7 acres should not be includ- ed in the lease; Buffington testified by dep- osition as follows: "Yes, sir, I will tell you how it happened. I didn't consider that I had any right to that. I had already deeded it to them. I thought at that time it was theirs, and that ended it. I didn't want to get in any tangle, and I didn't have no right to that, because I had already deeded it."

Barnes agreed that the lease should cover only the mineral rights under the 33.5 acres, and should not cover the mineral rights un- der 2.7 acres. Barnes drew the lease and in- tended and believed that the words he used expressed the agreement actually made. His description included these words: "Except that part of Out Lot 9 West Division hereto- fore deeded to Wichita & Midland Valley Railroad Co. for right of way, * * * and containing 33.5 acres, more or less."

The plaintiff acquired the lease by as- signment from Barnes about three weeks aft-

er it was executed. Plaintiff in its reply admits that "one C. B. Schoenfelt, on plaintiff's behalf purchased the assignment," etc. Barnes told Schoenfelt that the lease did not cover the right of way. Schoenfelt testifies: "Before he put his signature to the assignment he told me the right of way wasn't included in the lease and therefore it wasn't included in the assignment. I conveyed that information to my superior, Mr. Piggott. He held the office of Superintendent of the Land Department." This undisputed evidence makes it entirely clear that the plaintiff did not believe it was acquiring the mineral rights under the 2.7 acres when it took the assignment. Needless corroboration is, however, found in the fact that in 1924 the plaintiff in writing agreed to pay the Midland Valley Railroad Company 1½ per cent. royalty if the Midland would not permit any one else to drill on its right of way; and in 1927 entered into another contract with the Midland in which it is recited that the plaintiff owns oil and gas leases "adjoining" the right of way. If the plaintiff believed it had acquired the mineral rights under the right of way, it certainly would not have agreed to pay a substantial royalty to prevent their unlawful appropriation by another. In 1927 Buffington executed an oil and gas lease to Corn for the 2.7 acres intended to be excepted from the 1923 lease. The plaintiff now claims that the 2.7 acres passed under the 1923 lease to Barnes—that that lease covered 36.2 acres and not 33.5 acres, as recited therein—and seeks to quiet its title thereto as against Corn and those claiming under him.

The master and the trial court found upon ample and undisputed testimony, that by a mutual mistake the parties to the 1923 lease did not reduce their actual agreement to writing; and that the plaintiff, when it acquired the lease, knew that the original parties intended that only the 33.5 acres should be covered thereby. We are asked to overturn these findings because of certain answers made by Mr. Buffington in the course of a very artful cross-examination. Counsel for the plaintiff led the old gentleman—86 years old and in a hospital—to say that he had conveyed the 2.7 acres; that having conveyed it, he didn't own it; that he didn't want to lease what he didn't own; that he wanted to convey what he did own; and then the question and answer relied on:

"You wanted to convey all that part of outlot 9 you actually owned, or thought you owned? A. Yes, that is the way I figured it. Eight acres is what we call it."

It is never satisfactory to determine property rights by an isolated answer of a witness, particularly under the circumstances of this examination. It is better to look to all the answers of all the witnesses. Taking the record as a whole, we are entirely satisfied that the actual facts are as found by the master and trial court, and as herein recited. A very strong bit of evidence as to the actual agreement is that the lease itself uses language which, to all but trained lawyers who have examined certain particular decisions, means that the right of way is excepted from the mineral grant, and only 33.5 acres is conveyed. That is what it says; that is what it would mean to a layman.

The plaintiff argues that since Mr. Buffington could not go upon the right of way to drill for the minerals in the 2.7 acres, there was no sound reason why he should have excepted them from the 1923 lease. That is beside the point; Buffington owned the mineral rights under 36.2 acres in 1923; he had a right to sell all, or part, or none, without giving or having any reason therefor. The point is, what did he sell to Barnes? He sold 33.5 acres; his reason, or lack of reason, for not selling more is unimportant. Nor is the argument sound as far as it has bearing on whether he did make the agreement that both parties thereto testify he did make. In the first place, in 1923 no one knew whether or not he could go on the right of way to drill; that question was not settled until July 30, 1928, when the opinion came down in Midland Valley R. Co. v. Sutter (C. C. A. 8) 28 F.(2d) 163. Prior to that time his right "was at least doubtful," as it was "difficult to wholly reconcile the Kansas decisions on this question," to use the language of the Court of Appeals. But even if the old gentleman could have accurately forecast the decisions of the courts that came down years later, he would have known that the railroad did not own the minerals in the 2.7 acres, and that it could not have drilled on its own right of way without his consent; and he may have believed the railroad company would pay him more for a lease than he was getting from Barnes. However, no reason could be better than the one he testified to: He had made one warranty as to this 2.7-acre tract; he did not want to make another; he did not "want to get in any tangle"—to have his declining years harried by lawsuits. If he was willing to forego the bonus on this 2.7 acres to avoid a "tangle," it was his business; the fact is, he did forego it, and did not intend to convey it.

■ The words used by the parties in undertaking to except the 2.7 acres did not accomplish the purpose. Following a long line of applicable decisions which are based on principles of public policy, it has been conclusively determined that the words used in the 1923 lease conveyed the mineral rights under the 2.7-acre tract. Roxana Pet. Corp. v. Corn (C. C. A. 8) 28 F.(2d) 168, and cases there cited; Roxana Pet. Corp. v. Jarvis, 127 Kan. 369, 273 P. 661; Barker v. Lashbrook, 128 Kan. 595, 279 P. 12.

The special master and the trial court held that the description in the 1923 clause was ambiguous; received evidence in aid of construction; and then construed it to exclude the 2.7 acres. The master and the trial court believed they were constrained to so hold by reason of certain language used by the court on the first appeal. We do not so read the opinion of that court. What that court said was that even if it was ambiguous, it did not justify a dismissal of the bill; that in case of ambiguity, resort must be had to the surrounding circumstances in order to ascertain the intent of the parties. Nor do we think the description is ambiguous. A word is not ambiguous because the dictionary ascribes to it a meaning different from what the user thought it meant; nor is a phrase ambiguous because the courts have ascribed to it a meaning different from what it means in everyday English.

■ This leaves for determination the correctness of the decree reforming the contract. Courts are reluctant to reform the terms of written engagements, and do not do so unless the proof is of the clearest and most satisfactory character; moreover, there can be no reformation unless there is an antecedent agreement which has not been accurately reduced to writing. Columbian Nat. Life Ins. Co. v. Black (C. C. A. 10) 35 F.(2d) 571, and cases there cited. In the case at bar, the proof of such an antecedent contract, and of the mutual mistake made in reducing it to writing, fully measures up to the exacting standard.

■ It is suggested that the mistake, if there be one, is a mistake of law, and that courts are powerless to relieve against such mistakes. Where a writing accurately expresses the agreement made, a party thereto is not entitled to relief because the legal results flowing from such agreement are different from what he believed them to be. But if, through legal mistake as to the meaning of words used, the writing does not express the agreement actually made, equity is not powerless. If a man intends to and does assign a contract, equity will not reform because he believed an assignment relieved him of liability as a matter of law. But if there is an antecedent agreement by all the parties that he shall be relieved of liability if he does assign, and by reason of lack of legal knowledge the writing inaptly expresses their agreement, equity may reform.

This principle has been long settled in the federal courts. In Oliver v. Mutual Comm. Marine Ins. Co., 2 Curt. 298, Fed. Cas. No. 10,498, the distinction above pointed out is elaborated. In 1823, Chief Justice Marshall discussed at length the English authorities bearing on the power of equity to reform a contract where the parties were mistaken as to the legal effect of the words deliberately used. In that case the bill alleged that the parties had agreed that the plaintiff should have a specific lien on certain vessels; that, under advice of counsel, an irrevocable power of attorney was executed under the belief that it created the specific lien agreed upon. The Supreme Court held the bill stated a cause of action, saying: "Although we do not find the naked principle, that relief may be granted on account of ignorance of law, asserted in the books, we find no case in which it has been decided, that a plain and acknowledged mistake in law is beyond the reach of equity." Hunt v. Rousmaniere, 8 Wheat. 174, 215, 5 L. Ed. 589. Relief was denied plaintiff on the second appeal, but in that opinion the Supreme Court held that: "There are certain principles of equity, applicable to this question, which as general principles, we hold to be incontrovertible. The first is, that where an instrument is drawn and executed, which professes, or is intended, to carry into execution an agreement, whether in writing or by parol, previously entered into, but which, by mistake of the draftsman, either as to fact or law, does not fulfil, or which violates, the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement." Hunt v. Rhodes, 1 Pet. 1, 13, 7 L. Ed. 27.

In 1878, an insurance policy was reformed to cover the interest of a partnership, as was orally agreed, although the parties, acting under a mistaken belief as to the law, deliberately caused the policy to be issued in the name of one of the partners. Snell v. Insurance Co., 98 U. S. 85, 25 L. Ed. 52. In Griswold v. Hazard, 141 U. S. 260, 11 S. Ct. 972, 999, 35 L. Ed. 678, the parties agreed to execute an appearance bond; through a mis-

take as to the meaning of the words used, a bond "to perform the judgment" was executed. The court reformed it. The case of Philippine Sugar, etc., Co. v. Phil. Islands, 247 U. S. 385, 38 S. Ct. 513, 62 L. Ed. 1177, is very much in point. In that case there was a prior agreement by which certain sugar mills, machinery, and a railroad, owned by the seller, were not to be included in a sale. The written contract of sale made no mention of them, but did use the phrase "all other improvements." The seller sought to reform the contract because, on account of a mistake as to the legal effect of the quoted phrase, the writing conveyed more than the parties had agreed upon. Relief was granted, the Supreme Court holding, at page 389 of 247 U. S., 38 S. Ct. 513, 514: "It is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties. The fact that interpretation or construction of a contract presents a question of law and that, therefore, the mistake was one of law is not a bar to granting relief."

The Court of Appeals of the Eighth Circuit passed upon the question many years ago, and the rule was laid down that a mistake or ignorance of legal rights may be dealt with as a mistake of fact, and that the power of equity to grant relief is not dependent upon the nature of the mistake which led to a failure to reduce the actual agreement to writing. Order of United Comm. Trav. v. McAdam (C. C. A.) 125 F. 358. In Barnett v. Kunkle (C. C. A. 8) 256 F. 644, appeal dismissed 254 U. S. 620, 41 S. Ct. 319, 65 L. Ed. 442, the Eighth Circuit was asked to reform a deed which purported to convey the entire estate in certain real estate. Both parties thought the grantor owned but a half interest. Later court decisions determined she owned the entire estate. The deed was reformed so as to convey but the half interest which was the subject of the trade. The court said that, "A mistake as to the extent of a party's interest in land is a mistake of fact and not of law, although it may be induced by a mistaken view of the law." See, also, Southern Surety Co. v. United States Cast Iron Pipe & F. Co. (C. C. A. 8) 13 F. (2d) 833; Skelton v. Federal Surety Co. (C. C. A. 8) 15 F.(2d) 756; Mathis v. Hemingway (C. C. A. 8) 24 F.(2d) 951; Cincinnati, I. & W. R. Co. v. Ind. Union Ry. Co. (C. C. A. 6) 36 F.(2d) 323, certiorari denied 281 U. S. 754, 50 S. Ct. 408, 74 L. Ed. 1164.

There is a wealth of other authority upon the subject, not all of it harmonious. But the rule is thoroughly embedded in federal jurisprudence. It has met the approval of eminent authority, Mr. Williston stating the rule clearly and concisely, as follows: "Where a written instrument fails to express the intention of the parties because of a mutual mistake as to the construction or legal effect of the words of the writing, though there is no misapprehension as to what words have been used, reformation is allowed." Williston on Contracts, § 1585.

We therefore conclude that, as between Buffington and Barnes, the lease should be reformed. Reformation cannot be had, however, against one who purchases for value in ignorance of the mistake and in reliance upon the terms of the lease. Is the plaintiff such an innocent purchaser? Knowledge of facts or circumstances which would put a person of ordinary prudence upon inquiry is knowledge of such facts as reasonable inquiry would disclose. Mathis v. Hemingway (C. C. A. 8) 24 F.(2d) 951, 956. The plaintiff is not an innocent purchaser. Before it acquired the lease, it was advised that it did not cover the 2.7 acres. It knew, therefore, that the parties had made a mistake in reducing their agreement to writing. The plaintiff bought and paid for 33.5 acres only; when it saw that the lease covered 36.2 acres, a mistake was apparent.

For these reasons, the decree reforming the lease and dismissing the plaintiff's bill is affirmed.